**UNITED STATES of America**

v.

**Gordon ALEXANDER, Appellant.**

**UNITED STATES of America**

v.

**Benjamin MURDOCK, Appellant.**

**Nos. 23190, 23783.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 21, 1970.

Decided April 21, 1972.*

Certiorari Denied Dec. 4, 1972.

See 93 S.Ct. 541.

As Amended Jan. 25, 1973.

---

* For denial of the petition for rehearing in No. 23,783, United States v. Murdock, see 153 U.S.App.D.C. ——, 471 F.2d 1040 *infra.*

Mr. Dorsey Evans, Washington, D. C., with whom Mr. George O. Ackerman, Washington, D. C., was on the brief for appellant in No. 23190.

Mr. Fred R. Joseph, Hyattsville, Md., with whom Messrs. Karl G. Feissner, William L. Kaplan, Thomas P. Smith, and Andrew E. Greenwald, Hyattsville, Md., were on the brief, for appellant in No. 23783.

Mr. Richard J. Hopkins, Washington, D. C. (appointed by this Court), also filed a brief for appellant in No. 23783.

Mr. Gregory C. Brady, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry and William H. Collins, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, McGOWAN, Circuit Judge, and RUSSELL E. SMITH,* Chief Judge, U. S. District Court for the District of Montana.

* Sitting by designation pursuant to 28 U.S.C. § 292(c) 1970).

PER CURIAM:

The convictions appealed from are affirmed (Judges McGowan and Smith for the court, Chief Judge Bazelon dissenting), except that in No. 23,190 appellant Alexander's convictions on three of the four counts of assault are vacated, as is also the sentence on the fourth, and the case is remanded for resentencing on such remaining assault count (Judges Bazelon and Smith for the court, Judge McGowan dissenting).

It is so ordered.

BAZELON, Chief Judge:

The extreme length of this opinion reflects the number and perplexity of the issues presented for review. While brevity may normally be a touchstone of good writing style as well as sound judicial practice, it is occasionally essential to write at length on issues of far-reaching importance. The grounds of error raised on this appeal cut across our entire system of criminal justice. Appellants raise a very substantial challenge to the trial court's rulings on the admissibility of evidence, instructions to the jury, sentencing, expert testimony, and the nature of criminal responsibility.

At issue here are much more than technical rules of law devoid of any significance outside a courtroom or law school lecture hall. A racial epithet hurled at appellants by one of their victims touched off an explosion of violence and bloodshed, an explosion that reverberates the traumas of our entire society. We cannot rationally decry crime and brutality and racial animosity without at the same time struggling to enhance the fairness and integrity of the criminal justice system. That system has first-line responsibility for probing and coping with these complex problems.

The tragic events which gave rise to this appeal might possibly have been avoided by various means. Proponents of legislation for the effective control of firearms will find powerful ammunition here. But such measures can never reach the root causes of crime so long as we remain in ignorance of the mental agonies that produce bizarre and violent behavior. Criminal trials—and, above all, the responsibility defense—compel us to explore these problems, and thereby offer some slight hope that we will learn, in the course of deciding individual cases, something about the causes of crime. Not only the defendant but the criminal justice system as a whole has a vital interest in insuring that trials are conducted without significant error and in a manner that guarantees the ventilation of all the pertinent issues and information.[1] We cannot afford to obscure the difficult questions for the sake of speed and efficiency in obtaining convictions, since efficiency of that order yields a specious economy. Appellate courts must scrutinize carefully the record of trial, and expose—where necessary with opinions as lengthy as this one—the difficulties that plague our efforts to improve the quality of the criminal justice system.

On the evening of June 4, 1968, five men and a woman—all white—walked into a hamburger shop, stood by the take-out counter, and ordered some food. The men were United States Marine Lieutenants in formal dress white uniforms; the woman was a friend of one of them. They noticed three Negro men sitting at the other end of the counter; these were appellants Alexander and Murdock and one Cornelius Frazier.

What ensued in the restaurant had the tragic result that both Alexander and Murdock drew guns on the group, and that shots were fired that left two of the Marines dead and another and the woman seriously wounded. At a joint trial by jury in February, 1969, Alex-

---

1. One ironic aspect of this case is that appellant Murdock was indicted, tried, and convicted under the incorrect name of Benjamin Murdock. His true name, according to the presentence report, is Murdock Benjamin. For the sake of consistency, this opinion will refer to him by the incorrect name with which he has now been saddled.

ander and Murdock were each found guilty of carrying a dangerous weapon, and of four counts of assault with a dangerous weapon. Murdock, in addition, was found guilty of two counts of second-degree murder. A separate hearing for Murdock on the issue of insanity was held in November, 1969, at the close of which the jury returned a verdict of guilty on all counts. Appellants received consecutive sentences as to several counts, totalling five to twenty-three years for Alexander, and twenty years to life for Murdock.[2]

Since the case presents numerous and complicated issues and since the reasoning which underlies the Court's decision is expressed in part in this opinion and in part in the separate opinion by Judge McGowan, this opinion begins with a table of contents describing the Court's disposition of each issue and indicating the pages at which the discussion of each issue is set forth.

PART I: TRIAL ISSUES .........928

A. Detailed summary of the evidence concerning the incident in the restaurant ...................928

B. *Alexander*: The imposition of separate convictions and consecutive sentences was improper where a defendant, by a single act, put in fear different members of a group toward whom his action was collectively directed.

BAZELON, C. J., *for the Court* 930
McGOWAN, J., *dissenting* .... 966

C. *Alexander*: It is unnecessary for the Court to decide whether the trial judge erred in instructing the jury that they could convict Alexander of murder, manslaughter, or assault with a dangerous weapon on the theory that he aided and abetted Murdock.

McGOWAN, J., *for the Court* .. 966
BAZELON, C. J., *dissenting* .. 934

D. *Alexander*: If erroneous, the submission to the jury of the murder and manslaughter counts was harmless.

McGOWAN, J., *for the Court* .. 966
BAZELON, C. J., *dissenting* .. 936

E. *Murdock*: The evidence was sufficient to support a finding of malice; the instruction on manslaughter was unnecessarily confusing, and a revised instruction is proposed.

BAZELON, C. J., *for the Court* 941

PART II: INSANITY HEARING ISSUES ................. 947

A. *Murdock*: The trial judge correctly denied the proposed instruction on diminished responsibility.

2. Cornelius Frazier was not charged with any criminal offense arising out of this incident. Appellants Alexander and Murdock were each indicted for two counts of first-degree murder, four counts of assault with a dangerous weapon, and carrying a dangerous weapon. At the close of the Government's case in the joint trial, the judge ruled that the Government had failed to establish the offenses of first-degree murder against either defendant. These counts were reduced to two counts of second-degree murder. Motions for judgments of acquittal at the close of the defenses were denied.

Alexander was sentenced to two to ten years each on counts three and four (ADW), the terms to run consecutively; one to three years each on counts five and

six (ADW), the terms to run concurrently with each other and consecutively to the sentences imposed on counts three and four; and one year on count seven (CDW), to run concurrently with the sentence imposed on count three.

Murdock was sentenced to fifteen years to life on the first count of second-degree murder; five years to life on the second count of second-degree murder, this sentence to run consecutively to the sentence imposed on count one; three to ten years on each of four counts of assault with a dangerous weapon, the terms to run concurrently with each other and with the sentence imposed on count one; and one year on count seven (CDW), this term also to run concurrently with the sentence on count one.

McGOWAN, J., *for the Court* . . 967
–968

BAZELON, C. J., *dissenting* . . 948

B. *Murdock*: The trial judge did not err in refusing to grant a new trial despite the exclusion of conclusory testimony by a government psychologist testifying in favor of the insanity defense.

McGOWAN, J., *for the Court* . . 967
–968

BAZELON, C. J., *dissenting* . . 952

C. *Murdock*: The trial judge did not err in instructing the jury with respect to the testimony relating to the defendant's "rotten social background."

McGOWAN, J., *for the Court* . . 968

BAZELON, C. J., *dissenting* . . 957

## PART I: THE TRIAL

*A. The Evidence Presented at Trial*

Five United States Marine Lieutenants—Ellsworth Kramer, Thaddeus Lesnick, William King, Frank Marasco, and Daniel LeGear—attended a dinner at the Marine Corps Base in Quantico, Virginia, on the evening of June 4, 1968, in celebration of their near-completion of basic officers' training. After dinner, they drove to Washington, arriving about midnight, still wearing their formal dress white uniforms. They stopped for about an hour-and-a-half at a nightclub, where they each had a drink. They were well-behaved and "conducted themselves like gentlemen." At the nightclub they met Barbara Kelly, a good friend of Lieutenant Kramer. They accompanied her to her apartment, which she shared with another young woman, and visited there with the two women until about 2:40 a. m. When the five Marines departed, Miss Kelly accompanied them, intending to return to the nightclub to meet another friend. Along the way, they decided to stop at a hamburger shop to get some coffee and sandwiches before the trip back to Quantico. The six of them entered the shop, stood by the take-out counter, and ordered their food. They noticed three Negro males sitting at the other end of the counter. As described by Lieutenant Kramer, "[T]heir hair was in Afro-bush cut, wearing medallions, jersey knit shirts, sport jackets. . . . [T]hey were what I consider in eccentric dress." The three men were Alexander, Murdock, and Cornelius Frazier. The critical events which subsequently took place in the restaurant were described by the four survivors of the Marine group and by Murdock and Frazier. Alexander chose not to take the stand.

According to the prosecution witnesses, Lieutenant Kramer realized that appellant Alexander was staring at him, and he returned the stare. "[I]t was on the order of a Mexican stand-off type thing where you just keep staring at one another for an indefinite period of time." No words were exchanged between the two men, and Lieutenant Kramer soon turned and faced the counter. Shortly thereafter Frazier, Murdock, and Alexander got up from where they were sitting and walked to the door behind the Marines. Murdock and Frazier left the shop, but Alexander stopped in the doorway. He tapped Lieutenant Kramer on the shoulder. When the Marine turned around, Alexander poked his uniform name tag and said, "You want to talk about it more? You want to come outside and talk about it more?" When Lieutenant Kramer replied, "Yes, I am ready to come out" or "Yes, I guess so," Alexander added, "I am going to make you a Little Red Ridinghood." At this point, Lieutenant King stepped up beside Lieutenant Kramer and made a remark variously reported by the prosecution witnesses as "What you God-damn niggers want?", "What do you want, you nigger?", "What do you want, dirty nigger bastard?", and "Get out of here nigger." Thereupon Alexander abruptly drew a long-barrelled .38 caliber revolver, cocked it, and pointed it at the group or directly into Lieutenant King's chest, saying, "I will show you what I want," or "This is what I want."

The Marines possessed no weapons whatsoever and, according to their testimony, were not advancing toward Alexander. As they stood there, shocked at the sight of the gun, Murdock reentered the shop at Alexander's left and rear, and drew a short-barrelled .38 caliber revolver. A series of shots suddenly rang out, and the Marines and Miss Kelly fell or dived to the floor. None attempted to retaliate because they all were taking cover and trying to get out of the line of fire. Alexander and Murdock withdrew from the shop, but one of them stuck his arm back into the shop and attempted—unsuccessfully—to fire his weapon several times more. Only Lieutenant Kramer attempted to identify this man, and he said it was Murdock.[3]

Lieutenants King and Lesnick were mortally wounded in the fusillade; they died within minutes. Lieutenant Kramer was wounded in the head, but he remained conscious, as did Miss Kelly, who had been shot in the hip. Only Lieutenants LeGear and Marasco were not hit.[4]

Alexander, Murdock, and Frazier fled to Alexander's automobile and drove off rapidly in the wrong direction on a one-way street. Alexander was driving, and as the car drove off, Murdock fired three more shots from the window of the car, at the door of the hamburger shop, and at people in the street. A nearby scout car raced after the fleeing car and stopped them within a few blocks. Two revolvers were recovered from the front floorboard of Alexander's automobile.

For the defense, Frazier and appellant Murdock testified that the Marines in the restaurant had been drunk and loud. Frazier testified that they had obstructed

his exit as he left. He walked around them and left the restaurant just ahead of Murdock, but when he looked back, Murdock had gone back inside. He then heard shots and ran to Alexander's car.

Murdock testified that when he realized that Alexander had not followed him out of the restaurant, he returned, and as he entered he heard someone say, "Get out, you black bastards." He then saw the Marine advancing towards him. Murdock called to Alexander to leave with him, and Alexander turned as if to go. Murdock then heard a "sound like all the feet in the place were moving," turned around himself, and saw Alexander's drawn gun. Murdock pulled his own gun, as a reflex, and testified that he "commenced firing about the time one of them was actually right up on me. . . . . [M]aybe a foot away." He testified that the other Marines were advancing toward him fast, and he felt they were going to kill him. On cross-examination he admitted that he emptied his fully-loaded revolver at the Marine group in the restaurant, testified that he didn't know if Alexander had fired, and admitted that he fired three shots from Alexander's gun from the window of the car as it was driven off.

Who fired the bullets inside the restaurant was an issue of some importance during the trial, but because of the testimony of the Government's firearms expert, both sides seem now to agree that Alexander did not fire his revolver inside the restaurant, and that Murdock—as he testified himself—emptied his gun at the Marines and Miss Kelly, picked up Alexander's gun in the automobile, and fired three shots with it from the window.[5]

3. Lieutenant LeGear, at whom the arm had pointed, assumed at the time that it was Alexander's, but admitted on the stand that he did not know.

4. As the case went to the jury, counts one and two charged second-degree murder of Lieutenants King and Lesnick, counts three to six charged assault with a dangerous weapon upon (respectively) Lieutenant Kramer, Miss Kelly, Lieutenant LeGear, and Lieutenant Marasco,

and count seven charged carrying a dangerous weapon.

5. Several of the surviving victims thought that Alexander did fire his gun in the restaurant. According to Lieutenant Kramer, Alexander pointed his gun into Lieutenant King's chest, and "[t]hen the shooting began." He went on:

At the time the shooting started, I transferred my look from Alexander to Murdock. I noticed that Murdock

## B. Multiple Assaults and Separate Convictions

■ Alexander was separately convicted of four counts of assault with a dangerous weapon for assaulting each of the four survivors of the Marine group.

The trial judge made the sentences on three of the four counts consecutive to one another.[6] Alexander claims that the evidence does not justify a finding that he assaulted each of the four survivors individually,[7] and that, accordingly, he

was in a crouch and he had this short barreled 38 in his hand was shooting at the time.

. . . . .

I saw him fire to the right and swing around to me.

Four days after the shooting, Lieutenant Kramer had signed a statement that Alexander had "started to fire" at the same time as Murdock, and this statement was introduced by the defense to impeach him. Lieutenant Kramer admitted that he was "not as sure today" as he was when he made the statement; "I did not see his finger pull the trigger, but I heard a pistol go off and I started to react."

Miss Kelly testified that when Alexander drew his gun, "He raised the gun and pointed it in our direction and he paused for about two or three seconds, and then he fired." She noticed that Murdock pulled a gun, but did not see him fire. On cross-examination she admitted that she did not see any smoke come out of Alexander's gun, and did not see any fire come out of it. "I just heard the sound of firing."

Q: Then you heard a sound, but you didn't see anything that you recall that you could point to now to indicate why you felt Gordon Alexander's gun was fired?

A: I saw him raise the gun and fire. That is all I recall.

Lieutenant Marasco said, "Well, there were no more words exchanged after Gordon Alexander's last words and the next thing I knew was that I heard a number of shots go off and I didn't exactly see who did the shooting. . . ."

Lieutenant LeGear agreed with Miss Kelly that Alexander had actually shot his gun, saying, "It looked to me like they [the bullets] were coming from Alexander's gun." But like Miss Kelly, he weakened his testimony on cross-examination, denying that he saw bullets or smoke come from the gun and agreeing that he simply heard the shots and concluded that Alexander had fired.

All four surviving victims agreed that Alexander held a long-barreled pistol in the restaurant. Murdock and Lieutenant Kramer both testified that Murdock held a short-barreled pistol. A long-barreled and a short-barreled pistol were recovered

from Alexander's car. Murdock's short-barreled pistol contained six empty cartridge cases, and Alexander's long-barreled pistol held three empty cartridge cases and three unspent bullets.

Four of the bullets fired inside the restaurant were recovered, two from Lieutenant King's body, one from Lieutenant Lesnick's body, and one from the floor. The Government firearms expert testified that all of these were fired from Murdock's pistol. The bullet which struck Miss Kelly remained in her body and was not examined; no mention was made of a sixth bullet. In addition, three bullets were found outside the restaurant. Two of these the Government expert positively identified as coming from Alexander's pistol; the third he identified as coming from the same type of pistol as Alexander's.

This evidence shows that the three shots fired outside the restaurant were fired from Alexander's gun, and that gun, when recovered, had only been fired three times. In the face of this expert testimony, the eye-witness testimony was too weak to permit the jury to find beyond a reasonable doubt that Alexander fired any shots inside the restaurant, and the jury ought to have been so instructed. Alexander does not allege this as error upon appeal, perhaps because he thinks it highly unlikely that any juror was persuaded that Alexander fired any shots. The Government seems to share this view, since it does not claim in its brief that the jury could have found that Alexander fired any shots.

6. See notes 2 & 4 supra.

7. The evidence precludes a conclusion that Alexander assaulted the four survivors by firing his pistol at them, see note 5 supra. And the author of this opinion is convinced that it also precludes a finding that he aided and abetted Murdock's firing at the group (see Part C infra). Judge McGowan and Judge Smith conclude, for the reasons stated in Judge McGowan's opinion, that the aiding and abetting theory—whatever its support in the evidence—was in fact rejected by the jury. See Judge McGowan's opinion at 966 infra. Alexander's assault convictions depend, therefore, upon his drawing his gun on the group and holding it

could have been convicted of but one offense of assault. The separate convictions and the consecutive sentences raise a substantial issue for this court.

■ The Supreme Court has faced in several different contexts the question whether a single criminal act or episode constituted one or more violations of a given statute.[8] It is undisputed that the critical factor is the intent of Congress. In addition, where the language of the statute or the statutory scheme in general does not fix the punishment "clearly and without ambiguity," a "rule of lenity" requires that courts resolve doubts about congressional intent against "turning a single transaction into multiple offenses."[9]

The facts of Ladner v. United States[10] resemble those of the present case, in that Ladner claimed to have fired but one shot at two federal officers; for that he was sentenced consecutively for separate violations of what is now 18 U.S.C. § 111, interfering with a federal officer in the performance of his duties. The Supreme Court held that there was insufficient evidence that Congress intended "that a single act of assault affecting two officers constitutes two offenses under the statute." The Government attempts to distinguish Ladner, reasoning that the statute at issue there was designed to further a single legitimate federal purpose, "by proscribing conduct that would impede performance of a task by federal officers," while the purpose of general assault statutes is to protect individual persons.[11] This distinction is supported

aimed at them, individually or collectively, before he ran out with Murdock after the latter emptied his gun.

We have no doubt that a jury could find that when a loaded gun is pointed directly at one member of a group as small and as close together as this one appears to have been, each member of that group is placed "in apprehension of receiving an immediate battery." See R. Perkins, Criminal Law 114 (2d ed. 1969). In this case however, the Government goes on to claim that the evidence permits a finding that Alexander did point his gun at each of the four survivors.

In fact, the evidence the Government cites is most noticeable for its indefinite and fragmentary character, particularly with regard to Lieutenants Marasco and LeGear. Lieutenant Kramer testified that "they" pointed "the gun" at Miss Kelly. Miss Kelly testified that Alexander raised his gun and "pointed it in *our* direction." Asked at whom he was pointing it when he fired (*see* note 5 *supra*), she replied, "Lieutenant Kramer and myself." She didn't remember his pointing it at anyone else. Lieutenant Marasco said that Alexander "pointed it in *our* direction, specifically towards Lieutenant Lesnick, I don't remember what else. . . ." [Emphasis added.] He did not remember anyone's pointing a gun at him. Lieutenant LeGear testified that when Alexander pulled out his gun, "he pointed in the general direction of Kramer, Lesnick and King."

Whatever conclusion may be drawn from this testimony, it is uncontested that Alex-

ander had his gun drawn on the group no more than the brief time that it took Murdock to reenter the restaurant, open fire, and empty his gun.

8. *See* United States v. Universal C. I. T. Credit Corp., 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952) (§ 15 of the Fair Labor Standards Act penalizes a course of conduct; each breach of the statutory duty owed to a single employee during any workweek may not be treated as a separate offense); Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (transporting two women across a state line on the same trip and in the same car constitutes one violation of the Mann Act); Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1956) (unlawful entry and robbery are not two offenses consecutively punishable under the Federal Bank Robbery Act); Ladner v. United States, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) (firing one shot at two federal officers constitutes one violation of what is now 18 U. S.C. § 111, interfering with a federal officer in the performance of his official duties).

9. Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

10. 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958).

11. *See* Sutton v. United States, 140 U.S. App.D.C. 188, 197 n. 17, 434 F.2d 462, 471 n. 17 (1970) (when the assault with a dangerous weapon provision was enacted

by Barringer v. United States,[12] in which this court upheld consecutive sentences for robbery of a store owner and his wife at the same time, in the same place. The court justified its holding by stating:

> [T]he Supreme Court has clearly indicated that where the principal legislative purpose is the protection of individual victims, the rule of lenity does not obtain. Ladner v. United States, 358 U.S. 169, 174 [79 S.Ct. 209, 3 L. Ed.2d 199] (1958); Ebeling v. Morgan, 237 U.S. 625 [35 S.Ct. 710, 59 L. Ed. 1151] (1915). Since there is no doubt that the robbery statute was designed to safeguard individual citizens from being robbed, we do not think that the District Court was wholly lacking in power to impose consecutive sentences in respect to the robbery charges here.

*Ladner* does, in fact, seem to suggest that if the Court had found that the principal legislative purpose of the statute were the protection of individual officers, so that each officer defined a unit of prosecution, then it would have upheld the consecutive sentences. But the other Supreme Court opinion cited in *Barringer*, Ebeling v. Morgan, points toward an altogether different theme. Ebeling pleaded guilty to six counts of tearing or cutting mail bags of the United States used in conveyance of the mails, with intent to steal the contents. Each count concerned a separate bag, and Ebeling received consecutive sentences on five of the counts; the Supreme Court affirmed.

Although the Court said "[I]t was the intention of the lawmakers to protect each and every mail bag from felonious injury and mutilation," it immediately continued:

> Whenever any one mail bag is thus torn, cut, or injured, the offense is complete. Although the transaction of cutting the mail bags was in a sense continuous, the complete statutory offense was committed every time a mail bag was cut in the manner described, with the intent charged.

This theme of distinct, successive offenses is consistent with the result in *Barringer*, for separate acts were necessary in that case to take different amounts of money from the owner and then from his wife.[13] The Fifth Circuit clearly had such an approach in mind when it approved consecutive sentences on two counts of assault with intent to murder two different individuals.[14] The defendant below had fired two shots, one at each victim. The court said:

> These were intentionally separate and distinct assaults upon two human beings. They constitute separate offenses. . . . If a single shot struck two people a different result might obtain [citing *Ladner*]; but that is not the case here.

The same theme recurs in this court's determinations whether to approve consecutive sentences when two different statutes have been violated during the same criminal episode.[15] Finally, we

---

in 1901, Congress was "going right down the scale from murder to assault in a menacing manner. . . . ").

12. 130 U.S.App.D.C. 186, 399 F.2d 557 (1968), cert. denied, 393 U.S. 1057, 89 S.Ct. 697, 21 L.Ed.2d 698 (1969).

13. Compare the language used in United States v. Hodges, 436 F.2d 676, 678 (10th Cir. 1971), where the court affirmed consecutive sentences on five counts of assaulting and resisting five different penal officers, in violation of 18 U.S.C. § 111:

> [T]he plain import of *Ladner* is that had there been *two* discharges of the shotgun, one discharge wounding one officer and the second discharge wounding another officer, such would consti-

tute *two* violations of the statute. [Emphasis in original] . . .

> The present case is certainly not an instance of a single blow by Hodges, for example, resulting in an "assault" on five different penal officers. Rather, Hodges gave each one of the five *individual attention*, and *in succession* he did forcibly assault and resist each of the five. . . . [Emphasis added.]

*Cf.* United States v. Lewis, 140 U.S.App. D.C. 345, 435 F.2d 417 (1970).

14. Vera v. Beto, 422 F.2d 1052 (5th Cir. 1970).

15. In this area, too, the critical factor is the intent of Congress. *See* Ingram v. United States, 122 U.S.App.D.C. 334, 353

think that the successive offenses approach is fully consistent with the Supreme Court's opinion in *Ladner* (in spite of the suggestion to the contrary in *Barringer*) and is in fact reinforced by that opinion.

The Court in *Ladner* was not content to rest upon its uncertainty over whether Congress meant to protect individual federal officers or "the orderly functioning of the federal government." It continued with a striking paragraph:

Moreover, an interpretation that there are as many assaults committed as there are officers affected would produce incongruous results. Punishments totally disproportionate to the act of assault could be imposed because it will often be the case that the number of officers affected will have little bearing upon the seriousness of the criminal act. For an assault is ordinarily held to be committed merely by putting another in apprehension of harm whether or not the actor actually intends to inflict or is capable of inflicting that harm. Thus under the meaning for which the Government contends, one who shoots and seriously wounds an officer would commit one offense punishable by 10 years' imprisonment, but if he points a gun at five officers, putting all of them in apprehension of harm, he would commit five offenses punishable by 50 years' imprisonment, even though he does not fire the gun and no officer actually suffers injury. It is difficult, without a clearer indication than the materials before us provide, to find that Congress intended this result.[16]

This line of argument seems to us fully applicable to Alexander's assaults. Under the Government's interpretation of the law, Alexander could have committed in this restaurant six offenses punishable by 60 years imprisonment, even if he did no more than draw his gun and hold it in such a manner that the five Marines and Miss Kelly were all put in apprehension. Such a disproportionate result requires a clearer showing of congressional intent than the present statutory scheme provides.

■■ We hold, therefore, that where by a single act or course of action a defendant has put in fear different members of a group towards which the action is collectively directed, he is guilty of but one offense.[17] Multiple convic-

F.2d 872 (1965) (improper to provide consecutive sentences for assault with intent to kill and assault with a dangerous weapon where there was but one assault) ; Irby v. United States, 129 U.S.App.D.C. 17, 390 F.2d 432 (1967) (*en banc*) (consecutive sentences upheld for robbery and housebreaking) ; Smith v. United States (Rozier v. United States), 135 U.S.App. D.C. 284, 418 F.2d 1120, cert. denied, 396 U.S. 936, 90 S.Ct. 280, 24 L.Ed.2d 235 (1969) (the actions and intent of defendant must constitute "distinct successive criminal episodes, rather than two phases of a single assault" to allow consecutive sentences for assault with intent to kill and assault with a dangerous weapon) ; United States v. Lucas, 142 U.S.App.D.C. 366, 441 F.2d 1056 (1971) (consecutive sentences upheld for assault with a dangerous weapon and carrying a dangerous weapon). *See also* Sutton v. United States, 140 U.S.App.D.C. 188, 434 F.2d 462 (1970) (discussing robbery and assault with a dangerous weapon) ; United States v. Butler, 149 U.S.App.D.C. 300, 462 F.2d 1195 (1972). The con-

tinuing vitality of these cases, however, must be considered in light of the recently enacted D.C.Code § 23–112, 84 Stat. 610 (1970).

16. 358 U.S. at 177, 79 S.Ct. at 213.

17. It might be argued that this entire problem could be resolved by holding that the sentences must be concurrent instead of holding that the defendant has committed but one offense. Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L. Ed.2d 370 (1957), where the defendant was convicted of two counts of violating the Federal Bank Robbery Act, 18 U.S. C. § 2113, seems to suggest that approach. We decline to follow that approach, however, for two reasons. First, Ladner v. United States, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) and Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), the cases most closely in point, specifically held that the statute at issue had been violated only once. And second, the vitality of the concurrent sentences doctrine is rapidly waning. *See, e. g.,*

tions and consecutive sentences will be appropriate only where distinct, successive assaults have been committed upon the individual victims.[18] Accordingly, we must vacate the conviction on three of the four counts,[19] vacate the sentence on the remaining count, and remand to the District Court for re-sentencing on a single count.[20]

## C. The Aiding and Abetting Instruction

At the close of the trial the judge charged the jury that they could find either defendant guilty of second-degree murder or assault with a dangerous weapon on an aiding and abetting theory. For the reasons set forth in Judge McGowan's opinion, a majority of the panel finds it unnecessary to decide the validity of the charge to the jury on aiding and abetting. It is my view that the charge was erroneous and that the error was prejudicial to the defendant. As a result, I would reverse the one count of assault left standing by Part B of this

opinion, and I would remand for a new trial.

Defending the charge, the Government does not contend that the jury could have found that Alexander fired his gun at the same time that Murdock did, and by doing so aided and abetted Murdock. Such an argument would run headlong into the insufficiency of the evidence that Alexander fired his gun inside the restaurant.[21] Rather, the Government argues that the evidence "permits an inference of concerted criminal action . . . . The jury could find that appellant knowingly associated himself in some way *with the criminal venture* and sought by his presence or some action to make it succeed. [Emphasis added.]" In my view, a conviction based on the theory that Alexander aided and abetted Murdock's actions would be founded upon sheer speculation.

The evidence offered by the Government is insufficient to disprove the hypothesis—strongly suggested by the tes-

Benton v. Maryland, 395 U.S. 784, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969) ; United States v. Hooper, 139 U.S.App.D.C. 171, 432 F.2d 604 (1970) ; United States v. Spears, 145 U.S.App.D.C. 284, 449 F.2d 946 (1971). *But see* United States v. Leach, 429 F.2d 956 (8th Cir. 1970).

18. While we do not now try to specify the precise contours of this rule, it seems clear that shots fired or blows struck at different individuals will give rise to separate offenses appropriate for consecutive sentences. *See* United States v. Hodges, 436 F.2d 676 (10th Cir. 1971) (described and quoted in note 13 *supra*) ; United States v. Lewis, 140 U.S.App.D.C. 345, 435 F.2d 417 (1970) ; Vera v. Beto, 422 F.2d 1052 (5th Cir. 1970) ; Thorne v. United States, 406 F.2d 995 (8th Cir. 1969) (Blackmun, J.) ; *cf.* Barringer v. United States, 130 U.S.App.D.C. 186, 399 F.2d 557 (1968), cert. denied, 393 U.S. 1057, 89 S.Ct. 697, 21 L.Ed.2d 698 (1969).

19. While the evidence cannot support a finding that Alexander himself committed four distinct acts of assault which would permit all four counts of assault to stand, it might be argued that the four counts could be upheld on the theory that Alexander aided and abetted Murdock, who did commit four acts of assault. The author of this opinion is convinced, for

the reasons set forth in Part C *infra*, that Alexander could not be convicted on any count as an aider and abetter. Accordingly, it is unnecessary for me to decide whether a person who commits a single act can be convicted of multiple counts of assault merely because his single act aided and abetted another person who did commit several distinct acts of assault. Judge Smith, who joins in the holding that separate convictions of assault must be predicated on separate and distinct acts, finds it unnecessary to decide the validity *vel non* of the aiding and abetting instruction. He does conclude, however, that any error was harmless, because he and Judge McGowan are convinced that the jury rejected the aiding and abetting theory. *See* Judge McGowan's opinion at 966 *infra*. For that reason, Judge Smith agrees that Alexander's conviction of multiple counts of assault cannot be saved by any theory of vicarious liability.

20. The author of this opinion would hold that a prejudicial error regarding the jury instruction requires reversal even of this one count. *See* Parts C and D *infra*. The majority's postition on this issue is stated in Judge McGowan's opinion at 966 *infra*.

21. *See* note 5 *supra*.

timony of all the witnesses—that Alexander was acting entirely on his own when he tapped Lieutenant Kramer on the shoulder and asked him to step outside, that it was entirely for his own protection that he drew his gun when Lieutenant King stepped forward, and that he had every intention of backing out of the restaurant and leaving. At that point Murdock reentered the restaurant, drew his own gun, and commenced firing. The Government's evidence is insufficient to prove that this was not a complete and horrifying surprise to Alexander. No evidence shows that Alexander even knew Murdock had a gun, much less expected him to fire it at insulting strangers. To refer to the Government's own theory, there is insufficient evidence of a "criminal venture." The Government does not suggest that appellants entered the restaurant intending to wait for Marines who had not yet arrived, and it would be sheer speculation for the jury to find that they hatched a plan of assault or murder after the Marines came in.

In arguing the motion for judgment of acquittal to the judge below, the Government suggested that the jury could infer that Alexander "was assisting Murdock in the sense that he was holding back King and holding back Kramer while Murdock was performing the fatal shooting." If Alexander's action had apparently had such a result, perhaps even if it had been intended to have such a result, a basis of aiding and abetting may have been laid. But there was no evidence that any of the victims were in fact "held back" by Alexander's gun *while* Murdock was shooting. On the contrary, all the testimony indicates that as soon as shots began to be fired the Marines and Miss Kelly dived for cover and did everything they could to get out of the way. And on the circumstances of this incident, the jury could not possibly be convinced beyond a reasonable doubt that Alexander *intended* to aid Murdock by holding back any Marine who tried to attack them while Murdock was firing.

Another argument—one that appealed to the trial judge below—is that in some sense Alexander incited the behavior that resulted, since it was he who precipitated the confrontation with Lieutenant Kramer. The difficulty with this argument is that Alexander's "inciting" words and action were directed to the wrong person—to Lieutenant Kramer, not to Murdock, who was apparently already outside when Alexander's "inciting" began. The aiding and abetting statute [22] is aimed, *inter alia*, at one who incites another to commit a criminal offense—that is, spurs him on, encourages him, arouses him to action. The incitor is then as guilty as the principal he has encouraged. It would fly in the face of language as well as legal tradition [23] to hold that one can violate an aiding and abetting statute by "inciting a situation" or "inciting" one who becomes a victim of the criminal act at issue. [24]

---

22. D.C.Code § 22–105: "In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be."

23. *See* R. Perkins, Criminal Law 658–63 (2d ed. 1969).

24. This is not to say that "inciting a situation" may not be made criminal by the legislature: inciting a riot is an obvious example. The point is simply that this particular statute and the general law of aiding and abetting (and of principals of the second degree) concern *X*'s criminal liability for the acts of *Y*, whom *X* has encouraged or assisted.

As a final point, the Government, in its closing argument, suggested that Alexander was aiding and abetting because he drove the automobile during the joint flight. This was obvious error, since the act of driving the car would have made him only an accessory after the fact to the murder or assaults inside the restaurant. Under the law of the District, an accessory after the fact is not guilty as a principal, like an aider and abettor, but guilty of a separate lesser offense. D.C. Code § 22–106. In its brief on appeal,

I would hold, therefore, that it was error to instruct the jury that it could convict Alexander of second degree murder and assault with a dangerous weapon, even if his own actions did not constitute these offenses, by finding that he aided and abetted Murdock.

## D. Harmless Error

While I am convinced that the aiding and abetting theory should not have been placed before the jury, it does not follow automatically that Alexander's conviction on all counts of assault must be reversed.[25] It could be argued, after all, that the defense was in no sense prejudiced by the submission of the erroneous charge.

The prejudicial impact of the instruction must be assessed in light of our holding that a defendant who puts a group of people in fear by a single act has committed only one offense. The evidence in this case demonstrates that Alexander did not take separate, distinct acts which would support multiple convictions. At most, he was guilty of one assault, and his guilt on that count would be established if even a single person had been placed in fear.

At first glance it seems unlikely that the defendant would have been acquitted if the aiding and abetting instruction had not been offered. The evidence is very strong that Alexander drew his gun and aimed it at Lieutenant King (whom he was not charged with assaulting) and equally strong that that act placed a group of people in fear. But in considering the weight of the evidence against Alexander, it is essential to keep in mind his substantial claim of self-defense.

However improbable it is that a jury would disbelieve the evidence that Alexander drew his gun on the Marine group, we can scarcely be as certain that they would take the additional step of rejecting his attempt to excuse the act. Whether he drew his gun is a simple question of fact; whether he has an adequate defense, however, involves (1) the reasonableness of his grounds to believe that he was in imminent danger of death or serious bodily injury, (2) the relevance of his failure to retreat, (3) the degree to which the force he used was proportionate to the danger he faced, and (4) whether he so provoked the conflict that he lost his claim of self-defense.[26] These, at any rate, were issues committed to the jury in the self-defense instruction in this case. Without this claim, the evidence that Alexander was guilty of at least one of the counts of assault with a dangerous weapon would indeed be overwhelming. Its presence, however, raises the possibility that some members of the jury allayed their doubts about Alexander's justification for drawing his gun by reminding themselves that they had been instructed that they could find him guilty of aiding and abetting Murdock's assaults.[27]

the Government has amended its argument and urges only that Alexander's driving is a "factor supporting appellant's guilty involvement. . . . Appellant did not attempt to run away from Murdock or to disassociate himself from him; rather, they ran together to appellant's automobile. . . . " In the circumstances of this case, such evidence is as consistent with innocence of aiding and abetting as with guilt.

25. See note 19 supra.

26. It might be thought that Alexander stands little chance of winning before any jury because of this last point. Alexander, after all, is said to have tapped Lieutenant Kramer on the shouder, poked his name tag when he turned around, and asked if he wanted to step outside and fight. See p. 928 supra. This evidence, however, must be considered in the light of the long-standing rule that mere words, standing alone, do not constitute provocation or aggression. So the jury was instructed in this case. Compare 40 Am.Jur.2d Homicide § 64 (1968), with 6 Am.Jur.2d Assault and Battery § 77, at 71 (1963). Alexander's invitation was not to immediate combat. It is difficult to believe that any trial judge would take this self-defense claim from the jury.

27. The self-defense claim pertaining to Murdock's acts of firing his gun is of course on much weaker ground, because of the significantly greater force employed.

It may seem anomalous to argue that the aiding and abetting instruction contributed to the jury's verdict on the assault counts, since Alexander was *acquitted* of second-degree murder while Murdock was *convicted* of that offense. Given the jury's apparent rejection of the theory that Alexander aided and abetted Murdock as to the killing of Lieutenant King, it appears unlikely that the jury would have relied on that very theory in convicting Alexander of assault.

Nevertheless, prejudice may take subtle and diverse forms, especially where improper counts are submitted to the jury. Since the evidence could not, in my view, support a conviction on the theory that Alexander aided and abetted Murdock in the killing of Lieutenant King—much less on the theory that Alexander himself killed King—it is clear to me that the count charging murder in the second degree was improperly submitted. We should not affirm Alexander's conviction until we have examined the different kinds of prejudice that may result from the submission to the jury of improper counts, even though a verdict of acquittal has been returned on those counts.

A landmark case in this area is United States ex rel. Hetenyi v. Wilkins, 348 F. 2d 844 (2d Cir. 1965) (Marshall, J.), cert. denied, Mancusi v. Hetenyi, 383 U.S. 913, 86 S.Ct. 896, 15 L.Ed.2d 667 (1966). There, the Second Circuit reversed a second-degree murder conviction on the ground that

> there was a reasonable possibility that the conduct of the trial and the deliberations of the jury were affected by the fact that Hetenyi was [improperly] indicted, prosecuted and charged with first degree murder . . . . [28]

Specifying the kind of prejudice it had in mind, the court said:

> The mere fact that Hetenyi *could* have —logically and legally—been convicted of second degree murder on the basis of all the evidence, does not mean that he *would* have been so convicted if he were not also charged with first degree murder. For example, it is entirely possible that without the inclusion of the first degree murder charge, the jury, reflecting a not unfamiliar desire to compromise might have returned a guilty verdict on the first degree manslaughter charge on the same evidence. [29]

Such concerns—the effect of having additional, more serious issues in the case, the probability of a compromise verdict, the effect upon trial counsel's focus and tactics—have been deemed worthy of serious consideration by this court. [30] And the Supreme Court, in a

---

28. 348 F.2d at 864. Presence of constitutional error required the high "reasonable possibility" standard.

29. 348 F.2d at 866.

30. *See* Howard v. United States, 128 U.S. App.D.C. 336, 389 F.2d 287 (1967). There the trial judge had charged the jury on first and second degree murder and manslaughter. The jury returned a verdict of guilty on second degree murder. This court assumed that the trial judge erred in denying appellant's motion for acquittal of first degree murder, but found that any error in the denial would be harmless. Appellant had claimed that he was prejudiced in three different ways:

[First], that the "brooding omnipresence" of the death penalty forced trial counsel to discuss that punishment and to focus on the issue of premeditation and deliberation; [second,] that the submission of the first degree charge may have induced the jury to compromise by returning a verdict of murder in the second degree rather than one of acquittal or manslaughter; and [third] that, if the motion to acquit had been granted at the end of the Government's case, counsel in developing trial tactics might not have felt compelled to put appellant on the stand. The court rejected these claims only in the course of a careful examination of the record. With respect to the first, it found that Government counsel had mentioned the death penalty only to announce that the Government was not recommending it, that the defense's exceedingly brief presentation was not prejudiced by a focus on premeditation and deliberation, and that argument and instructions on these issues did not confuse or mislead the jury.

unanimous opinion by Chief Justice Burger, has recently endorsed the *Wilkins* decision. In Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970), the Court held that a state could not retry an accused for murder after an earlier guilty verdict on the lesser included offense of voluntary manslaughter had been set aside because of trial error. In response to Georgia's plea that the second jeopardy was harmless error because appellant was not convicted of murder, the Court said:

> The Double Jeopardy Clause . . . is cast in terms of the risk of hazard of trial and conviction, not of the ultimate consequences of the verdict. To be charged and to be subjected to a second trial for first-degree murder is an ordeal not to be viewed lightly. *Further, and perhaps of more importance, we cannot determine whether or not the murder charge against petitioner* *induced the jury to find him guilty of the less serious offense of voluntary manslaughter rather than to continue to debate his innocence.* See United States ex rel Hetenyi v. Wilkins, . . . [31]

In one particular context, the *Wilkins* case has been cited repeatedly to this court, and its apparent lesson rejected.[32] These are cases in which the death penalty was improperly before the jury, and the grounds for the court's decision are instructive for this case. In Bailey v. United States (Humphries v. United States) [33] appellant was charged with violation of the District of Columbia rape statute,[34] but convicted only of carnal knowledge of a female under sixteen years. The court held that the death penalty provision of the rape statute was void under United States v. Jackson,[35] and the dissent argued vigorously that the conviction for carnal knowledge must therefore be reversed, relying on *Wilkins*

With respect to the second, it found no real likelihood of compromise, particularly no likelihood of a manslaughter conviction if only second degree murder and manslaughter had gone to the jury. Finally, it found no real likelihood that defense counsel's trial strategy of putting defendant on the stand would have been different if the higher charge had been absent. The court did not cite the *Wilkins* case in its opinion.

*See also* Evans v. United States, 130 U.S.App.D.C. 114, 397 F.2d 675 (1968), cert. denied, 394 U.S. 907, 89 S.Ct. 1016, 22 L.Ed.2d 218 (1969), where appellants were charged and tried on counts of first degree murder, felony murder, and attempted robbery. They were convicted of the last two, but acquitted of the first. In response to appellants' claim that there was insufficient evidence of first degree murder and that this error required reversal of the convictions, the court said:
> Even were we to accept Appellants' invitation to follow the decision of the Second Circuit in United States ex rel. Hentenyi [*sic*] v. Wilkins, . . . , we would not find prejudice here. . . . *Hentenyi* involved a lesser-included offense, and the court there relied on the likelihood that the jury compromised to reach its verdict. The present case involves a felony murder charge, which is a separate charge, not a lesser-included offense. *The court instructed the*

*jury*—more favorably than the law required—*that it was to consider the felony murder charge first and if they found Appellants guilty, not to reach the first degree murder charge but to acquit.* The Government failed to object; and the jury found Appellants guilty of felony murder but acquitted as to the first degree murder which suggests that the jury approached its "task responsibly . . . to sort out discrete issues given to them. . . ." Spencer v. State of Texas, 385 U.S. 554, 565, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). [Emphasis added.]

31. 398 U.S. at 331, 90 S.Ct. at 1762 (emphasis added).

32. Bailey v. United States (Humphries v. United States), 132 U.S.App.D.C. 82, 405 F.2d 1352 (1968) (Fahy, J., dissenting); Duckett v. United States, 133 U.S.App.D.C. 305, 410 F.2d 1004 (1969) (Fahy, J., dissenting); Johnson v. United States, 138 U.S.App.D.C. 174, 426 F.2d 651 (1970) (en banc) (Fahy, J., dissenting), cert. dismissed as improvidently granted, 401 U.S. 846, 91 S.Ct. 1258, 28 L.Ed.2d 523 (1971).

33. 132 U.S.App.D.C. 82, 405 F.2d 1352 (1968).

34. 22 D.C.Code § 2801 (1967).

35. 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

and Justice Fortas's dissenting opinion in *Cichos v. Indiana.*[36] In the text of its opinion, the *Bailey* court distinguished *Wilkins* on the following ground:

> In *Wilkins* the indictment in all three trials was for first degree murder and the prosecutor actively sought the death penalty and presented evidence for that purpose. Unlike *Wilkins*, the prosecutor here specifically stated that he was not going to seek the death penalty and presented no evidence to that end.[37]

In a footnote, the court offered still another ground for distinguishing *Wilkins*:

> . . . *Wilkins*, like the dissent in *Cichos*, was dealing not with *penalties* but with the submission of improper *offenses* to the jury. Here, the offense was the same, there was no "choice" offered to the jury in this respect . . . . [38]

In later cases, the court has been content to rest, implicitly, on the holding in *Bailey and Humphries.*[39] In at least one of these later cases, the opinions reveal, again, that the Government was not seeking the death penalty.[40]

The lesson to be drawn from these cases seems clear. The presence of a higher count when it is not warranted does not automatically require reversal of a conviction on a lower count. The question is exactly what it is in all harmless error determinations: what effect is the error likely to have had on the jury's understanding of the case and its deliberations?[41] All the factors listed in the cases discussed will be relevant, together with the weight of all the evidence.[42]

To what result do the relevant considerations point in Alexander's case? First and foremost, the Government's evidence was insufficient to support a finding *either* that Alexander fired the shots that killed Lieutenant King or Lieutenant Lesnick *or* that Alexander aided and abetted Murdock's firing of the fatal shots. Therefore, unlike *Bailey & Humphries, Johnson,* and *Duckett,*[43] in this case the jury was improperly provided with a choice among *offenses.*[44]

Second, the primary focus of the entire case was upon the murder and manslaughter counts. Unlike *Howard, Bailey & Humphries,* and *Johnson*[45] the prosecution eagerly pursued Alexander's conviction on the higher counts. The Government's closing argument explicitly mentioned both the possibility that Alexander fired some shots and the aiding and abetting theory as grounds for convicting him of second degree murder. Alexander's able defense counsel, in turn, felt obliged to devote nearly twice as much time to the murder counts as he did to Alexander's self-defense claim to assault. Finally, the major portion of the trial judge's instructions necessarily concerned the murder and manslaughter counts.

36. 385 U.S. 76, 81, 87 S.Ct. 271, 17 L.Ed. 2d 175 (1966).

37. 132 U.S.App.D.C. at 87, 405 F.2d at 1357.

38. *Id.* n. 8.

39. *See* cases cited note 32 *supra.*

40. Johnson v. United States, 138 U.S. App.D.C. at 182 & n. 8, 426 F.2d at 659 & n. 8 (Fahy, J., dissenting).

41. *See* Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

Chief Justice Traynor, in a useful contribution to an area largely unmarred by scholarship, has suggested that a test of "high probability" for harmlessness be adopted for both constitutional and unconstitutional error. R. Traynor, The Riddle of Harmless Error 35–51 (1970).

42. Traynor, *supra* note 41, at 36.

43. Cited in note 32 *supra.*

44. And, of course, it is not true that just one improper count went to the jury, but *four*, two of murder and two of manslaughter.

45. *See* note 30 (*Howard*), page 939 (*Bailey & Humphries*), and pages 938–939 (*Johnson*) *supra.*

Third, since the evidence that Alexander was guilty of the offense of assault with a dangerous weapon was not overwhelming—because of the presence of the self-defense claim—the possibility that the verdict was reached as a result of a compromise is a real one.[46]

All of these considerations must be viewed in the light of various confusing elements in the case. In particular, the jury may have been misled about the self-defense claims. The trial judge gave a single, lengthy instruction on this issue which did not explicitly differentiate between Alexander and Murdock, between the different times at which their self-defense claims could have arisen, or between the different amounts of force they used. The potential confusion here is critical for Alexander; to the extent that his self-defense claim is made to appear little different from Murdock's, Alexander is seriously prejudiced. It is difficult to believe that either the trial judge or Alexander's able trial counsel would have let this instruction pass without objection had their attention not been so focused upon the four more serious charges.

Whatever result might be appropriate if these considerations stood alone, taken together they compel us to conclude that Alexander did not receive the trial to which he was entitled on the charge of assault with a dangerous weapon. On this particular record, the possibilities of prejudice from errors which occurred are too substantial to permit me to vote for affirmance of an assault conviction.[47] The question is, admittedly, a close one. It is more likely than not that Alexander would have been convicted of assault even if the trial had been conducted without error or confusion. More is at stake, however, than the result of the trial. It is our responsibility to insure not only that Alexander is guilty, but also that his guilt is determined by a process which is conducive to a full and fair ventilation of the pertinent facts and issues. Even outstanding trial counsel, such as Alexander's, cannot provide his client with the best possible defense if he is compelled, through no fault of his own, to tilt at windmills. I am unable to say that the result of trial would inevitably have been the same if Alexander's counsel and the

46. It is useful to contrast the considerations which led this court to affirm a carnal knowledge conviction when the offense had been improperly treated as capital. The court said:

> On the facts of this case we find it overwhelmingly improbable that appellant was the victim of . . . a compromise. The prosecution never requested the death penalty, or even adverted to it. The trial judge gave it only a one-sentence mention in his charge to the jury. And the details of the crime were not such as to make it likely that the jurors seriously considered imposing the death penalty. Moreover, the evidence did not support a conviction for any lesser included offense, against which the jury might have been influenced by the judge's passing mention of the death penalty. A statutory rape had been consummated, and the only real issue in the case was whether appellant was the perpetrator. On that question the evidence was compelling.
>
> Since we find no prejudice, the decision below is affirmed.

Springfield v. United States, 131 U.S.App. D.C. 166, 403 F.2d 572 (1968). Note that in the context of the case before us, assault with a dangerous weapon was a lesser included offense of the improper counts of second degree murder and manslaughter. *Cf.* Evans v. United States, 130 U.S.App.D.C. 114, 397 F.2d 675 (1968), cert. denied, 394 U.S. 907, 89 S.Ct. 1016, 22 L.Ed.2d 218 (1969), quoted in note 30 *supra.*

47. Since many of the cases we have cited concern errors which affected, directly, only *one* count, e. g., United States ex rel. Hetenyi v. Wilkins, *supra*, it is important to remember that the jury was explicitly told that aiding and abetting was a theory upon which they could convict Alexander of assault, as well as murder or manslaughter.

Moreover, the presence of four counts of assault, when only one was warranted, compounds the difficulty of determining the harmlessness of any error. Certainly the presence of those four counts increased the chances that the jury might compromise and agree to convict on at least one count.

jury had been able to focus their attention on the questions genuinely in issue. I am unable to say that the claim of self-defense would not have been accepted if counsel and the jury had not been sidetracked by an improperly submitted count. Under these circumstances, I would conclude that the instruction on aiding and abetting was prejudicial error, and I would reverse and remand for a new trial.

### E. Sufficiency of the Evidence and Instructions on Provocation

Turning to Murdock's contentions, we consider first his claim that the evidence was insufficient to permit the jury to find him guilty of second degree murder rather than manslaughter. Though the question is a close one—as it must almost invariably be when a defendant's state of mind is at issue—the panel agrees that the evidence presented in this case justifies a finding of malice.

While it appears that Murdock was inside the restaurant or close enough to the door to hear Lieutenant King's racial remark, the surviving Marines and Miss Kelly all denied that any other provocative conduct took place.[48] According to their testimony, they were all standing motionless—in shock—staring at Alexander's gun when Murdock came in, drew his gun, and began firing. We think, therefore, that the jury was presented with sufficient evidence to find that Murdock was not adequately provoked to justify the deadly force with which he retaliated.

But though we resolve the sufficiency of the evidence question against Murdock, our study of the record in this case has brought to our attention a difficulty with the existing instructions on manslaughter. To present the problem in the context of a concrete example, we quote in the margin the entire instruction on manslaughter given by the able trial judge in this case.[49] Paragraphs have been lettered for ease of reference. We note that the instruction follows

48. Appellant Murdock does not attempt to attack the traditional rule that "mere words standing alone, . . . no matter how insulting, offensive, or abusive, are not adequate to reduce a homicide from murder to manslaughter." D.C. Bar Ass'n, Criminal Jury Instructions for the District of Columbia, No. 87 (1966). *See* Allen v. United States, 164 U.S. 492, 496, 17 S.Ct. 154, 41 L.Ed. 528 (1896); 40 Am.Jur.2d Homicide § 64 (1968).

49. [Instruction on manslaughter]
Now, ladies and gentlemen, there is involved in count one and count two [the second degree murder counts] what is known in law as a lesser included offense.
[A] If the jury determines that neither defendant is guilty of murder in the second degree, then the jury is required to consider whether or not one defendant or both defendants are guilty of a lesser included offense known in law as manslaughter. And, the Court will now instruct the members of the jury as to the elements of manslaughter.
[B] Manslaughter is the unlawful killing of a human being without malice.
[C] Manslaughter is committed when a human being is killed unlawfully *in the sudden heat of passion caused by adequate provocation.*

[D] The essential elements of the offense of manslaughter, each of which the Government must prove beyond a reasonable doubt are:
(1) That the defendant inflicted an injury or injuries upon the deceased from which the deceased died; and
(2) That the defendant so injured the *deceased in the heat of passion;* and
(3) That the heat of passion was caused by *adequate provocation;* and
(4) That the homicide was committed without legal justification or excuse.
[E] It is necessary that the defendant have inflicted an injury or injuries upon the deceased, and that the deceased have died as a result of such injury.
[F] The defendant must have injured the deceased in the heat of passion, caused by *adequate provocation* and without malice.
[G] If *a homicide is committed in the heat of passion, caused by adequate provocation, the offense is manslaughter rather than murder in the second degree.* In addition to adequate provocation, there must be heat of passion caused by that provocation. Both the provocation and the passion must exist at the time the injury or injuries causing the death of the deceased are inflicted.

closely the Junior Bar Section's Model Instruction No. 88.[50]

■ Two different themes run through this instruction. The first concerns the essential elements of manslaughter. Assuming a defendant is charged only with manslaughter, what should the jury be told they must find to convict him? Reflecting this theme are paragraphs A, B, most of D, E, and L. The second theme, however, concerns the distinction between manslaughter and second degree murder—with the factors that will *reduce* the offense from murder to manslaughter. This theme, of course, is appropriate only when, as in this case, the defendant is charged with second degree murder as well as manslaughter. The paragraphs which clearly reflect this second theme are paragraphs C, D(2) & (3), F, G, H, I, J, and K.

■ The intermingling of these different themes has extraordinary results, the most striking of which is paragraph D. According to that paragraph, it is an element of manslaughter that the defendant injured the deceased in the heat of passion caused by adequate provocation, and the Government must prove this beyond a reasonable doubt. Taken literally, this has the ludicrous result that a jury which finds the evidence in balance on the question of provocation can convict the defendant *neither* of second degree murder *nor* of manslaughter. Of course the law does not require the Government to run the risk of thus falling between two stools. Manslaughter, as paragraph B quite properly states, is "the unlawful [that is, unexcused] killing of a human being without malice." [51] If malice is proved beyond a reasonable doubt and no affirmative defense applies, the defendant is guilty of murder; if malice is not proved, he is guilty of manslaughter. The only defense to a charge of causing another's death—aside from self-defense, insanity, duress, and so forth—is that the homicide was inadvertent and that defendant's negligence, if any, was not sufficient to convict him of involuntary manslaughter.[52]

[H] "Heat of passion" includes rage, resentment, anger, terror, and fear. Heat of passion may be produced by fear as well as by rage.

[I] Provocation, *in order to be adequate to reduce the offense from murder in the second degree to manslaughter,* must be such as might naturally induce a reasonable man in the passion of the moment to lose self-control and commit the act on impulse and without reflection.

[J] A blow or other personal violence may constitute adequate provocation. But a trivial or slight provocation, entirely disproportionate to the violence of the retaliation, is *not adequate provocation to reduce the offense from murder in the second degree to manslaughter.* Mere words standing alone, however, no matter how insulting, no matter how offensive, no matter how abusive, are *not adequate to reduce a homicide from murder in the second degree to manslaughter.*

[K] It must be such provocation as would arouse a reasonable, sober man. If the provocation aroused the defendant because he was intoxicated, and would not have aroused a sober man, *it does not reduce the offense to manslaughter.*

[L] It is necessary that the homicide have been committed without legal justification or excuse.
[Emphasis added.]

50. D.C. Bar Ass'n, Criminal Jury Instructions for the District of Columbia, No. 88 (1966).

51. Fryer v. United States, 93 U.S.App.D.C. 34, 207 F.2d 134, cert. denied, 346 U.S. 885, 74 S.Ct. 135, 98 L.Ed. 389, rehearing denied, 346 U.S. 928, 74 S.Ct. 305, 98 L.Ed. 420 (1953); Hansborough v. United States, 113 U.S.App.D.C. 392, 308 F.2d 645 (1962). The standard treatises agree that this definition, or one almost identical to it, concisely summarizes the law of manslaughter. See, e. g., 1 R. Anderson, Wharton's Criminal Law and Procedure § 271 at 574 (1957); 2 W. Burdick, The Law of Crime § 457 at 181 (1946); R. Perkins, Criminal Law 51 (2d ed. 1969). "Unlawful killing without malice," it should be noted, may be voluntary or involuntary. For a thorough discussion of involuntary manslaughter, see Judge Leventhal's concurring opinion in United States v. Dixon, 135 U.S.App.D.C. 401, 419 F.2d 288 (1969).

52. *See* note 51 *supra* and note 53 *infra.*

From what we have said, it would seem that the confusing nature of the instruction leads only to a risk that guilty men might be acquitted of both manslaughter and second degree murder. But juries are likely to have enough common sense to avoid the conclusion that a man who has intentionally shot another, without legal justification, is innocent of any crime. There is a danger, accordingly, that a jury might resolve the confusion in another way: by thinking that in some sense the burden of proof is on the *defendant* to show that the provocation was adequate to reduce murder to manslaughter. Over and over again, the instruction repeats that the provocation must be *adequate* before defendant can be acquitted of second degree murder and convicted instead of manslaughter. Since the Government is clearly trying to get the more severe verdict, the jury might therefore conclude that the defendant, as the only party really interested in showing provocation, must persuade it of the adequacy of the provocation.

All it takes to cure this defect, of course, is to tell the jury plainly what the law is: that when the defendant, or the Government, has introduced evidence of provocation, then the Government must prove the *absence* or *inadequacy* of the provocation beyond a reasonable doubt. To make this as clear as possible to the jury, it should be explained that provocation is *not* an element of manslaughter (whether voluntary or involuntary), but a *defense* to second degree murder. The Government is not required to disprove provocation in its case in chief, unless its own evidence would support a finding of adequate provocation. If the defense introduces some evidence of provocation, the Government will have the opportunity to rebut. Once some evidence of provocation is in the case—whether introduced by the Government or the defense—defendant is entitled to an instruction on provocation and manslaughter, the burden of persuading the jury of the absence of provocation is on the Government, and the jury is entitled to a clear instruction to that effect.[53]

53. The theme of what sort of provocation is adequate to reduce second degree murder to manslaughter dominates almost all discussions of the role of provocation in the law of homicide. *See, e. g.*, R. Perkins, Criminal Law 53–69 (2d ed. 1969); 2 W. Burdick, The Law of Crime § 462 at 186–200 (1946). This, of course, is the question of substantive law. It is rare to find a discussion of the burden of going forward and the burden of persuasion on provocation. At least one treatise writer, however, has faced the problem and has stated succinctly the position we endorse here:

It is stated that the burden of proof of provocation rests upon the defendant. However, *provocation must be regarded as a defense* traversing the essential ingredients of all offenses which require proof of premeditation and malice. Hence, the burden on the defendant is merely that of going forward with evidence of the provocation and the defendant is entitled to an acquittal, when malice or premeditation is essential, if the evidence raises a reasonable doubt.

1 F. Wharton, Criminal Evidence § 25 (12th ed. R. Anderson 1957) (emphasis added, footnotes omitted).

For a discussion relevant to the question of when an instruction on the lesser included offense of manslaughter will be required, see United States v. Comer, 137 U.S.App.D.C. 214, 421 F.2d 1149 (1970); United States v. Sinclair, 144 U.S.App.D.C. 13, 444 F.2d 888 (1971).

The presence of the issue of provocation in a murder case will automatically mean that the defendant is entitled to an instruction on manslaughter. Because of this close connection, there might be nothing wrong with calling adequate provocation an "element" of manslaughter, were it not for the confusion this tends to create about the burden of persuasion.

We are adopting here the nomenclature of the National Comm'n on Reform of Federal Criminal Laws, Study Draft of a New Federal Criminal Code (1970). According to the scheme of § 103 of that draft, a "defense" need not be negated by proof at trial "unless the issue is in the case as a result of evidence sufficient to raise a reasonable doubt on the issue." Once the issue is in the case, however, the Government must prove its contention beyond a reasonable doubt. On the other hand, an "affirmative defense" must be proved by the defendant by a preponderance of the evidence.

With these considerations in mind, paragraph A of the manslaughter instruction in this case reads quite peculiarly. It says:

> If the jury determines that neither defendant is guilty of murder in the second degree, then the jury is required to consider whether or not one defendant or both defendants are guilty of . . . manslaughter. And, the Court will now instruct the members of the jury as to the elements of manslaughter. [Emphasis added.]

What follows, as we have already indicated, is not just a concise statement of the law of manslaughter, but a detailed statement of several issues which it is clearly important for the jury to consider when it is deciding whether to convict defendant of second degree murder.

▪▪▪ However startling we find the confusions present in the instructions in this case, we do not think that they require reversal of this conviction.

The confusion, we have suggested, may prejudice the Government as well as the defendant. More important, we cannot ignore that instructions of this form have for years gone uncriticized by scholars, defense lawyers, experienced trial judges, and—we do not hesitate to add—appellate judges with many years on the bench. Therefore, we make our holding on this issue prospective only. In trials held after the date of this opinion, in which the defendant is entitled to a charge on the lesser included offense of manslaughter, the instructions must take a form which, first, distinguishes clearly between those factors which constitute defenses to second degree murder and those which constitute the elements of manslaughter, and second, clearly instructs the jury that when a defense to second degree murder—adequate provocation, for example—has been put in issue, the Government must prove its absence beyond a reasonable doubt.[54] To aid trial judges and law-

---

54. In the case at hand, we are concerned with an instruction on manslaughter which elucidates the local District of Columbia statute, 22 D.C.Code § 2405:

> Whoever commits manslaughter shall be punished by a fine not exceeding one thousand dollars, or by imprisonment not exceeding fifteen years, or by both such fine and imprisonment.

It has never been disputed that this provision incorporates by reference the common law crime of manslaughter.

Our analysis applies equally well, however, to the federal crime of manslaughter, even though the more specific language of the relevant statute, 18 U.S.C. § 1112, might seem to present a difficulty:

> "(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
> "Voluntary—Upon a sudden quarrel or heat of passion.
> "Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."
> "(b) Within the special maritime and territorial jurisdiction of the United States,
> "Whoever is guilty of voluntary manslaughter, shall be imprisoned not more than ten years;

> "Whoever is guilty of involuntary manslaughter, shall be fined not more than $1,000 or imprisoned not more than three years, or both."

The legislative history of this section shows no indication of an intention to make a "sudden quarrel" or "heat of passion" an element of the offense, requiring proof beyond a reasonable doubt by the Government.

Section 1112(a) is the direct descendant of Section 274 of an Act to revise, codify, and amend the penal laws of the United States, March 4, 1909, ch. 321, 35 Stat. 1143. Section 274 differed only in the paragraph on involuntary manslaughter:

> Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.

The 1909 law was the culmination of years of drafting and research. A special commission had been appointed in 1897 to revise and codify the federal criminal and penal laws. In acts of 1899 and 1901, the commission's mandate had been extended to all the laws of the United States. See Special Joint Comm. on the Revision of the Laws, Revision and Codification of the Laws, Etc., H.R.Rep.No. 2, 60th Cong., 1st Sess. 1–5 (1908); S. Rep. No. 10, 60th Cong., 1st Sess. 1–5

yers, we include below a sample instruction which we think would have been appropriate in the case before us. Essentially, the instruction actually given in

(1908). The main purpose was an editorial one:

> [The Commission] shall bring together all statutes and parts of statutes relating to the same subjects, shall omit redundant and obsolete enactments, and shall make such alterations as may be necessary to reconcile the contradictions, supply the omissions, and amend the imperfections of the original text.

*Id.* In addition, however, more substantive work was expected:

> [The Commission] may propose and embody in such revision changes in the substance of existing law; but all such changes shall be clearly set forth in an accompanying report, which shall briefly explain the reasons for the same.

*Id.*

On manslaughter, the federal law before revision appeared in Revised Statutes § 5341 (1878 ed.):

> Every person who, within any of the places or upon any of the waters [within the exclusive jurisdiction of the United States] unlawfully and willfully, but without malice, strikes, stabs, wounds, or shoots at, or otherwise injures another, of which striking, stabbing, wounding, shooting, or other injury such other person dies, either on land or sea, within or without the United States, is guilty of the crime of manslaughter.

The Commission's Final Report of 1906 gave the law of manslaughter the following simple formulation:

> Sec. 8931. Whoever, unlawfully and willfully, but without malice, shall kill another, is guilty of manslaughter, and shall be fined not more than one thousand dollars and imprisoned not more than ten years.

In its detailed comments on the specific provisions, the Commission said:

> Speaking in general terms, it may be stated that the statutes of nearly, if not quite, all of the States of the Union make homicide with malice and premeditation murder in the first degree; homicide with malice, but without premeditation, murder in the second degree, and homicide without malice or premeditation manslaughter. These lines of demarcation have been observed in the sections which we here submit. . . .
>
> *Section*[] *8931* . . . .—The definition of manslaughter in section 5341, Revised Statutes, is amplified so as to include a number of specific acts re-

sulting in death, which do not come within the language of that section.

1 Final Report of the Commission to Revise and Codify the Laws of the United States 113 (1906).

Two years later, the Commission's last Final Report issued, in which the manslaughter section, now labeled section 8902, was in precisely the words which became law in 1909 (Act of Mar. 4, 1909, ch. 321, § 274, 35 Stat. 1143, quoted *supra*). No explanation was given for the change in wording; the official comments contained exactly the language quoted above from the 1906 Final Report. 1 Final Report of the Commission to Revise and Codify the Laws of the United States 130 (1908).

An explanation of sorts does appear in the report of the Special Joint Committee on the Revision of the Laws, *supra:*

> Under existing law there is no statutory definition of the crimes of murder or manslaughter. The Commission reported sections defining such crimes, and the committee has changed them in some respects. [*Id.* at 12.]
>
> . . . . .
>
> Section 270 [Murder]: This section enlarges the common-law definition, and is similar in terms to the statutes defining murder in a large majority of the states. [*Id.* at 24.]
>
> Section 271 [Manslaughter]: What is said with respect to section 270 is true as to this section, manslaughter being defined and classified in language similar to that found in the statutes of a large majority of the states. [*Id.* at 24.]

No additional comments appear in the 1909 Conference Report. H.R.Rep. No. 2270, 60th Cong., 2d Sess. (1909); S.Doc. No. 741, 60th Cong., 2d Sess. (1909).

These documents manifest a congressional intention to differentiate between voluntary and involuntary manslaughter, and to provide a more severe penalty for the former. But they do not indicate that Congress intended to make "sudden quarrel or heat of passion" an element of voluntary manslaughter, requiring proof beyond a reasonable doubt. Therefore, if a killing was intentional, but the issue of "heat of passion" in doubt, it would appear that the jury can convict defendant of voluntary manslaughter. The contrary result would require an expansion of involuntary manslaughter or the defendant would be guilty of no crime at all. Neither of these alternatives strikes us as a responsible reading of the statute.

this case (set out in footnote 49, *supra*) has been rearranged and divided in two. The significant changes and additions are italicized.

[The following instruction, which may be called the instruction on provocation, would immediately follow whatever second degree murder instruction was given.]

*Now, there was evidence in this case that one or both defendants acted in the heat of passion caused by provocation on the part of one or more of the deceased. I shall now instruct you on the rule of provocation.*

If a homicide is committed in the heat of passion caused by adequate provocation, *then the defendant is not guilty of the offense of second degree murder.* In addition to adequate provocation, there must be heat of passion caused by that provocation. Both the provocation and the passion must exist at the time the injury or injuries causing the death of the deceased are inflicted.

"Heat of passion" includes rage, resentment, anger, terror, and fear. Heat of passion may be produced by fear as well as by rage.

Provocation, *in order to be adequate to acquit defendant of second degree murder,* must be such as might naturally induce a reasonable man in the passion of the moment to lose self-control and commit the act on impulse and without reflection.

A blow or other personal violence may constitute adequate provocation.

But a trivial or slight provocation, entirely disproportionate to the violence of the retaliation, is *not adequate provocation to acquit the defendant of second degree murder.* Mere words standing alone, no matter how insulting, no matter how offensive, no matter how abusive, are *not adequate to acquit the defendant of second degree murder.*

*You are reminded that the burden is on the Government to prove beyond a reasonable doubt that defendant is guilty of murder in the second degree. With regard to provocation, therefore, the Government must prove beyond a reasonable doubt that provocation did not occur, or that any provocation that did occur was not adequate as a matter of law, or that defendant was not in heat of passion caused by that provocation. In other words, if you have a reasonable doubt whether or not the defendant acted in heat of passion caused by adequate provocation, the verdict must be not guilty of murder in the second degree.*[55]

[The court would now move to the revised instruction on the elements of manslaughter.]

Now, there is involved in count one and count two what is known in law as a lesser included offense.

If the jury determines that neither defendant is guilty of murder in the second degree, then the jury is required to consider whether or not one defendant or both defendants are guilty of a lesser included offense known in law as manslaughter. And,

55. This sample instruction on provocation deliberately parallels the standard instruction on self-defense. For example, in the case before us the trial judge charged the jury:

Both defendants invoke another defense which I wish to cover at this time. That is the claim that the actions were taken in self defense.

[There follow the elements of self-defense, relating to reasonable grounds for belief, duty to retreat, deadly force, and so forth.]

· · · · ·

*If evidence of self-defense is present, the Government must prove beyond a reasonable doubt that the defendant did not act in self-defense.* If you find that the Government has failed to prove beyond a reasonable doubt that the defendant did not act in self defense, you must find the defendant not guilty. *In other words, if you have a reasonable doubt whether or not the defendant acted in self-defense, your verdict must be not guilty.*

[Emphasis added.]

the Court will now instruct the members of the jury as to the elements of manslaughter.

Manslaughter is the unlawful killing of a human being without malice.

The essential elements of the offense of manslaughter, each of which the Government must prove beyond a reasonable doubt, are:

(1) That the defendant inflicted an injury or injuries upon the deceased from which the deceased died; and

(2) That the homicide was committed without legal justification or excuse.

It is necessary that the defendant have inflicted an injury or injuries upon the deceased, and that the deceased have died as a result of such injury.

*It is not a defense to manslaughter that the homicide was committed in heat of passion caused by provocation.*[56]

The instructions we have given here are not meant to be rigidly followed.

They are presented only to show how the particular difficulty we have discussed in this opinion might be eliminated. We hope that trial counsel and judges will make every effort to determine how the jury may best be instructed to ensure that its members understand their function.

## PART II: THE HEARING ON CRIMINAL RESPONSIBILITY

Prior to trial, Murdock filed a notice of intent to rely on the insanity defense, as required by statute.[57] Alexander moved for severance, partly on the ground that he would be prejudiced by Murdock's insanity defense.[58] The court responded by bifurcating Murdock's trial sua sponte, in order to permit the trial on the merits of both defendants to go forward promptly without severing the trial of Murdock from that of Alexander.[59] Only after Murdock had been provisionally "convicted" at the first part of the bifurcated trial was he committed

---

56. This instruction may be appropriate in the case at hand. But where there is a possibility that the fatal injury was inflicted unintentionally, perhaps something like the following two paragraphs should be inserted in place of the last paragraph:

If you find that the defendant inflicted the fatal injury intentionally or voluntarily, it is not a defense to manslaughter that the injury was inflicted in heat of passion caused by provocation.

On the other hand, if you find that the defendant inflicted the injury unintentionally or involuntarily, then he may be found guilty of manslaughter only if the fatal injury resulted from recklessness in conduct involving extreme danger of death or serious bodily injury and gross deviation from the standard of conduct that a reasonable man would observe.

*See* United States v. Dixon, 135 U.S.App. D.C. 401, 407, 419 F.2d 288, 294 (1969) (Leventhal, J., concurring).

It should also be noted that an instruction similar to the one we have given for provocation would be necessary when evidence of mutual combat appears in a case. Mutual combat, like provocation, is a defense to second degree murder, but not

to manslaughter. *See, e. g.,* United States v. Hardin, 143 U.S.App.D.C. 320, 443 F.2d 735 (1970).

57. D.C.Code § 24–301(j).

58. Murdock had previously filed a motion for severance, based on the possibility of prejudice from a statement made by Alexander. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The court denied that motion when the government represented that it would not introduce the statement.

59. The trial court was wise to consider bifurcation, even in the absence of a request by either defendant. Bifurcation may sometimes serve the interests of judicial efficiency, as perhaps in this case. More important, bifurcation protects fundamental personal rights of the defendant, *see* United States v. Grimes, 137 U.S.App. D.C. 184, 190, 421 F.2d 1119, 1125 (1969) (statement of Chief Judge Bazelon). Accordingly, trial judges would be well advised to bifurcate insanity trials as a matter of course, and to conduct unitary proceedings only in the extraordinary case, or at the request of the defendant. *See* United States v. Bennett, 460 F.2d 872 at 878–882 (D.C.Cir. Jan. 19, 1972).

to St. Elizabeths Hospital for a mental examination.[60]

Murdock's confinement in the Hospital was unusually long, apparently because the facility was overcrowded.[61] During that time, he was examined by various members of the Hospital staff, and also by a private psychiatrist of his selection. Subsequently, he was examined at the jail by another private psychiatrist, appointed by the court at the request of the government. Nine months after the original trial, Murdock finally had the opportunity to submit his claim of mental disorder to a jury.[62] The jury found that he was criminally responsible for the acts charged, and accordingly convicted him.

The record of this second phase of the trial presents three distinct and important issues for review. First, Murdock claims the trial court erred in refusing to instruct the jury in accordance with a theory of "diminished responsibility." Second, when a government psychologist testified for the defense in conclusory terms, the court struck his testimony and denied Murdock's motion for a mistrial. Finally, in the charge to the jury, the court used language that seemed to tell the jury to disregard a portion of the evidence that was critical to Murdock's theory of the case.

The court has concluded, for the reasons set forth in Judge McGowan's separate opinion, that the record does not call for reversal on any of these grounds. Because the author of this opinion is persuaded that there is substantial merit in each of the three claims, his views are set forth below.

### A. Diminished responsibility

At the first part of the trial, the jury found that Murdock had committed the acts that constitute second-degree murder. That is, they found he had killed two people unlawfully and with the state of mind known to the law as "malice." In reaching that conclusion, the jury had before them only the evidence concerning the objective circumstances of the crime, and not the psychiatric evidence bearing on Murdock's mental condition.

Murdock contends that the information subsequently presented by the ex-

60. D.C.Code § 24–301 authorizes the court to commit a criminal defendant to a mental hospital for observation in the event of a question about his competency to stand trial. We have held, however, that the scope of the examination properly extends to the issue of criminal responsibility as well. United States v. Ashe, 138 U.S.App.D.C. 356, 359 n. 3, 427 F.2d 626, 629 n. 3 (1970) ; Winn v. United States, 106 U.S.App.D.C. 133, 270 F.2d 326 (1959).

61. Murdock was originally committed to the Hospital for a 90-day period of observation. Twice the Hospital sought extensions of time because of the large backlog of patients awaiting examination. The Hospital finally reported on his mental condition after he had been hospitalized for more than 150 days.

62. The judge recalled the jury that had tried the first part of the case, although it proved necessary to substitute two alternates. It may not always be wise to submit the insanity defense to the jury that tried the merits. See United States v. Bennett, 460 F.2d 872 at 881–882 (D.C.Cir. Jan. 19, 1972). A jury that has invested a substantial amount of time and effort in convicting a man at the first part of a bifurcated trial may well be reluctant to undo their work and acquit him at the insanity trial. Moreover, in some cases there is a clear danger that the evidence introduced at the merits trial will improperly prejudice the insanity defense. See, e. g., United States v. Bennett, supra (testimony describing "shocking details" of crime, ostensibly relevant only to merits, might be improperly considered by jury on issue of responsibility) ; United States v. (Thomas) Robinson, 142 U.S.App.D.C. 43, 67, 439 F.2d 553, 577 & n. 27 (1971) (McGowan, J., dissenting) (psychiatric testimony relating to voluntariness of confession might be improperly considered by jury on issue of responsibility). Ordinarily when the insanity trial is held immediately after the merits trial, there are strong reasons of convenience for submitting both parts of the case to the same jury. But those reasons are considerably less persuasive when the two trials are separated by a period of nine months, as they were in this case.

pert witnesses at the insanity hearing was relevant not only to the insanity defense, but also to the issue of malice. Accordingly, after the experts had testified at the insanity hearing, Murdock asked for an instruction permitting the jury to reopen the question of malice. He proposed to tell the jury:

> [M]ental unsoundness, though insufficient to entitle the accused to an acquittal under the legal test of responsibility, may nevertheless be sufficient to prevent the accused from forming malice aforethought, and thus diminish the defendant's responsibility or reduce the grade of the offense. . .
> If you find that the accused's mental condition resulted in a failure to formulate malice aforethought, you must find the accused guilty of only manslaughter.

The trial court rejected the proposed instruction, and this court today finds no error in that ruling. The majority relies primarily on prior decisions of this court, in which we rejected the doctrine of "diminished responsibility" in seemingly broad terms. In my view, however, there are several reasons why those precedents should not control the decision here. Accordingly, I would decide as a new question the issue presented by appellant's claim.

1. The starting point for any inquiry into diminished responsibility in this jurisdiction must be Fisher v. United States, 80 U.S.App.D.C. 96, 149 F.2d 28 (1945), aff'd, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946). In that case, as in this one, a homicide was apparently triggered by a racial epithet hurled at the defendant by the victim. In *Fisher*, psychiatric experts testified that the defendant had a psychopathic personality disorder, which they explained in some detail. He asked for an instruction telling the jury to consider this evidence not only in connection with the insanity defense, but also in connection with the claim that he did not in fact entertain the mental state of "premeditation and deliberation" that distinguishes first-degree from second-degree murder. The court rejected that instruction, and this court found no error, because (1) the psychiatric evidence in the case was not of a kind that tended to negate premeditation and deliberation, and (2) the proposed instruction "confuses the issue of insanity with the question whether the psychopathic characteristics of the appellant prevented him from forming the deliberate intent necessary to constitute first degree murder." 80 U.S.App.D.C. at 97, 149 F.2d at 29.

We left open, however, the possibility that in another case the psychiatric evidence might be of such a character as to be relevant on the issue of premeditation and deliberation. We also left open the possibility that an instruction on the matter could be drafted that would avoid confusing lack of premeditation with insanity.

The Supreme Court affirmed the decision on the ground that matters relating to law enforcement in the District are appropriately left for final decision by the local courts. 328 U.S. at 476, 66 S. Ct. 1318. But the Court went on to explore at some length the local rule to which it was deferring. On the basis of an examination of local precedent, the Court concluded that, in the District, evidence of mental disorder is a matter of law relevant only to the insanity defense and not to the issue of premeditation.[63]

In fact, however, the rule that can fairly be derived from our cases is somewhat more limited in scope.[64] We have never held that evidence of mental disorder is as a matter of law irrelevant to all state-of-mind issues apart from the insanity

---

63. "[W]e think it is the established law in the District that an accused in a criminal trial is not entitled to an instruction based upon evidence of mental weakness, short of legal insanity, which would reduce his crime from first to second degree murder." 328 U.S. at 473, 66 S.Ct. at 1323.

64. *See* Fisher v. United States, 328 U.S. 463, 489–490 & n. 11, 66 S.Ct. 1318 (1946) (Frankfurter, J., dissenting).

defense. The only issue on which we have held such evidence irrelevant is the state of mind called "malice," which distinguishes murder from manslaughter.[65] The theory of that holding is that malice refers not to a state of mind, but to an objective set of circumstances; it can be negated by evidence of circumstances that would provoke a reasonable man to act in the heat of passion, but not by evidence of actual subjective provocation and passion.[66]

If malice is properly measured by a wholly objective standard, then Murdock's claim must be rejected, not because we reject all notions of diminished responsibility, but because evidence of his subjective mental condition has no relevance to the legal issue of malice involved in this case. In a recent series of cases, however, we reviewed with some care the concept of malice,[67] and concluded, *inter alia,* that it is not entirely an objective matter, but has subjective elements as

well.[68] Consequently, it is no longer clear that evidence of the defendant's subjective mental condition is irrelevant on the question of malice, and Murdock's claim should not in my view be summarily dismissed on the authority of our prior cases.

To be sure, we have on occasion used sweeping language rejecting the whole concept of "diminished responsibility", but that language relates primarily to a claim different from that asserted by Murdock here. Under the name of "diminished responsibility," courts and commentators have dealt with at least two distinct concepts. First, it may be argued that in determining whether the defendant committed an offense with the requisite state of mind, the jury should consider the relevant psychiatric evidence as well as the evidence of the surrounding facts and circumstances. That is Murdock's claim, and has been accepted by a number of jurisdictions.[69] Second,

65. *E. g.,* (Walter) Stewart v. United States, 129 U.S.App.D.C. 303, 394 F.2d 778 (1968); Hart v. United States, 76 U.S.App.D.C. 193, 130 F.2d 456 (1942); Bishop v. United States, 71 App.D.C. 132, 107 F.2d 297 (1939) (voluntary intoxication may negate premeditation but not malice); United States v. Lee, 4 Mackey 489, 54 Am.Rep. 293 (1886). In *Lee* the court refers to premeditation, but the term is there used for the mental element that distinguishes murder from manslaughter, and not for the mental element that distinguishes first-degree from second-degree murder, since at the time of that decision, the crime of murder had not yet been separated into degrees in the District of Columbia.

66. Compare the use of objective criteria for malice with the widespread use of subjective criteria for premeditation. *See, e. g.,* Weihofen & Overholser, Mental Disorder Affecting the Degree of a Crime, 56 Yale L.J. 959, 969–72 (1947); Note, Premeditation and Mental Capacity, 46 Colum.L.Rev. 1005 (1946).

67. *E. g.,* United States v. Bush, 135 U.S.App.D.C. 67, 70, 416 F.2d 823, 826 (1969); Green v. United States, 132 U.S.App.D.C. 98, 100, 405 F.2d 1368, 1370 (1968); see Carter v. United States, 141 U.S.App.D.C. 259, 262–264, 437 F.2d 692, 695–697 (1970), cert. denied, 402

U.S. 912, 91 S.Ct. 1393, 28 L.Ed.2d 655 (1971), and cases cited *id.* at 697 n. 24.

68. *See, e. g.,* United States v. Wharton, 139 U.S.App.D.C. 293, 298, 433 F.2d 451, 456 (1970), *quoting* Belton v. United States, 127 U.S.App.D.C. 201, 204–205, 382 F.2d 150, 153–154 (1967); United States v. Dixon, 135 U.S.App.D.C. 401, 406–407 n. 8, 419 F.2d 288, 293–294 n. 8 (1969) (Leventhal, J., concurring).

69. California is the leading jurisdiction admitting psychiatric evidence with respect to both premeditation and malice. *See, e. g.,* People v. Conley, 64 Cal.2d 310, 49 Cal.Rptr. 815, 411 P.2d 911 (1966) (Traynor, J.); People v. Gorshen, 51 Cal.2d 716, 336 P.2d 492 (1959); People v. Wells, 33 Cal.2d 330, 202 P.2d 53, cert. denied, 338 U.S. 836, 70 S.Ct. 43, 94 L.Ed. 510 (1949). That is the position taken by the Model Penal Code, see § 4.02, and Comment at 193 (Tent. Draft No. 4, 1955); § 201.3(1) (b), and Comment at 46–48 (Tent. Draft No. 9, 1959). Some jurisdictions limit the use of psychiatric evidence to the issue of premeditation, on the theory that malice is to be determined by an objective standard. *See, e. g.,* State v. McAllister, 41 N.J. 342, 352–354, 196 A.2d 786, 791–792 (1964). *See generally,* Annot., Mental or Emotional Condition as Diminishing Responsibility for Crime, 22 A.L.R.3d 1228 (1968).

it may be argued that in evaluating an insanity defense, the jury should be permitted to recognize degrees of insanity, and degrees of responsibility. This approach would focus not on the particular state of mind necessary for the offense, but rather on the general questions of insanity and responsibility; the jury would be permitted to find the defendant "partly responsible," and on that basis reduce the degree of his offense.[70]

It is this latter theory that was plainly rejected by this court en banc in (Willie) Stewart v. United States, 107 U.S.App. D.C. 159, 166, 275 F.2d 617, 624 (1960), rev'd on other grounds, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961). The defendant sought an instruction that evidence of "diminished intellect" could reduce the offense from first-degree to second-degree murder.[71] The court denied the request, and this court affirmed. In the view of the majority the evidence in question was adapted not so much to rebut the specific charge of premeditation, but rather to mitigate in general the gravity of the offense. Judge Burger, writing for the majority, explained the rationale of the decision:[72]

> The problem of classifying, assessing and analyzing the results of the application of modern psychiatry to ad-

ministration of criminal law as it relates to gradations of punishment according to the relative intelligence of the defendant is beyond the competence of the judiciary. Courts are neither trained nor equipped for this delicate and important task. The basic framework for sentences of punishment must be established by the legislative branch.

When the legislative branch has established such a framework, however, it is surely within the judicial competence to implement the statutory scheme.[73] I do not read the *Stewart* opinion to hold otherwise. In the District of Columbia, Congress has established three gradations of punishment for homicide, to be determined in large part by the defendant's state of mind at the time of the offense. In order to administer that statutory scheme, the court need not make its own analysis relating degrees of punishment to psychiatric information. It need only admit into evidence, with appropriate instructions, the information needed by the jury to make the determinations called for by Congress. Thus *Stewart* does not in my view bar the introduction of relevant psychiatric evidence to negate the state of mind required for a particular crime.[74]

---

70. This concept of "partial responsibility" was adopted in the English Homicide Act of 1957, 5 & 6 Eliz. 2, c. 11, *quoted in* Model Penal Code, Comments to Art. 201, App. B, at 111 (Tent. Draft No. 9, 1959). The two doctrines are distinguished in F. Lindman & D. McIntyre, The Mentally Disabled and the Law 355–57 (1961).

71. The issue had initially been raised by amicus curiae on a prior appeal of the conviction. At that time we reversed for error in the instructions on insanity, and deferred consideration of the doctrine of diminished responsibility. Stewart v. United States, 94 U.S.App.D.C. 293, 214 F.2d 879 (1954).

72. 107 U.S.App.D.C. at 166, 275 F.2d at 624.

73. *See* Fisher v. United States, 328 U.S. 463, 493, 66 S.Ct. 1318, 1333, 90 L.Ed. 1382 (1946) (Murphy, J., dissenting): [J]uries constantly must judge the baffling psychological factors of delib-

eration and premeditation, Congress having entrusted the ascertainment of those factors to the good sense of juries. It seems senseless to shut the door on the assistance which medicine and psychiatry can give in regard to these matters, however inexact and incomplete that assistance may presently be. Precluding the consideration of mental deficiency only makes the jury's decision on deliberation and premeditation less intelligent and trustworthy. . . . Congress has already spoken by making the distinction between first and second degree murder turn upon the existence of deliberation and premeditation. It is the duty of the courts below to fashion rules to permit the jury to utilize all relevant eveidence directed toward those factors.

74. Not all psychiatric evidence relevant to the insanity defense will necessarily be relevant as well to the state-of-mind issue. *See, e. g.*, State v. DiPaolo, 34 N.J. 279, 297, 168 A.2d 401, 410 (1961).

2. Ordinarily any psychiatric evidence that is relevant to the questions of malice or premeditation will at least be before the jury when they consider those issues, even if it is not singled out in the instructions. Thus in *Fisher* and *Stewart,* when the jury decided the questions of malice and premeditation, they had heard all the psychiatric evidence in the case. Murdock's trial, on the other hand, was bifurcated; as a result the jury decided the question of malice in his case before they had heard any expert psychiatric testimony at all. Accordingly, it may be argued that in these circumstances Murdock had a right to the instruction he sought, even though he might not have had that right in a unitary proceeding.

In a unitary trial, the instruction would serve only to single out the psychiatric evidence for special attention in connection with the mental element of the crime, and perhaps to give it unwarranted emphasis. In a bifurcated trial, however, it serves the far more important function of making available for the first time highly relevant evidence on a critical element of the crime. For there are only two ways in a bifurcated trial to present to the jury psychiatric evidence that is relevant both to the insanity defense and to the issues of premeditation and malice: (1) introduce the same evidence at both parts of the trial,[75] or (2) ask the jury to reopen the issues of malice and premeditation at the insanity hearing, after they have heard the psychiatric evidence.

The first approach was not a viable alternative for Murdock, because at the time of the first part of his trial he had no access to expert assistance; the trial judge did not order a pretrial mental examination until after the first part of the trial had been completed.[76] Consequently, if the evidence was to be considered on the issue of malice at all, it had to be presented by means of the instruction he requested.

3. Even if I thought there were controlling precedent adverse to Murdock's claim, I would regard it as inappropriate to dispose of the claim summarily at this time. This court presently has under en banc consideration a number of cases raising fundamental issues in the field of criminal responsibility.[77] Concepts of diminished responsibility may well play a part in the ultimate resolution of these cases. If the court is unwilling at this time to give serious consideration to Murdock's claim, we should at least preserve his right to raise the claim in a subsequent proceeding, in the event this court reconsiders the various doctrines of diminished responsibility and reaches a conclusion consistent with his position.

B. *Conclusory testimony of government psychologist*

On the issue of criminal responsibility Murdock introduced two witnesses: Dr. E. Y. Williams, a private psychiatrist who examined him twice while he was confined at St. Elizabeths Hospital, and Dr. Elliott Blum, the chief psychologist in the Hospital's maximum security division. Throughout the direct examination of Dr. Blum, the court expressed dissatisfaction with the conclusory nature of his testimony, and repeatedly asked the witness to explain the factual basis for his conclusions. Finally, at the close of Dr.

75. This appears to be the practice in California. There is an obvious tension between the policy of bifurcation and the use of expert psychiatric evidence at both parts of the trial. Some of the problems that have emerged from the California experience are discussed in Louisell & Hazard, Insanity as a Defense: The Bifurcated Trial, 49 Cal.L.Rev. 805 (1961).

76. *See* pp. 947, 948 *supra.*

77. In United States v. Brawner [471 F.2d 969], No. 22,714, the court is considering a reformulation of its test of criminal responsibility. The issue of diminished responsibility is raised in Brief for William H. Dempsey, Jr. as Amicus Curiae at 45–52. In United States v. Moore, No. 71–1252, the court is considering the question whether a narcotics addict may be held criminally responsible for the purchase or possession of narcotics for his own use.

Blum's testimony, the judge announced that he intended to strike the testimony, on the ground that in the absence of underlying factual data the jury could properly give it no weight whatever. Murdock promptly moved for a mistrial, which was denied.

This court has long protested against conclusory expert testimony on the issue of mental illness and criminal responsibility. Never before, however, have we confronted the problem of finding an appropriate remedy at trial for testimony that is unacceptably conclusory.

1. As a first step, the trial judge in this case sought to remedy the deficiency in Dr. Blum's testimony by questioning the witness himself. While counsel bears the primary responsibility for eliciting an adequate explanation from his witness, the trial judge is to be commended for intervening in aid of that objective.[78] His questions did not, however, succeed in eliciting a satisfactory explanation from Dr. Blum.

In part that may be because the judge sought a kind of explanation that the psychologist found inappropriate and ir- relevant. Dr. Blum gave an opinion based on the results of a battery of psychological tests.[79] The judge apparently believed that such an opinion could be supported only by testimony reciting specific test questions and answers.[80] The psychologist, however, indicated that individual responses would be meaningless or even misleading, and that the defendant's answers should be interpreted by comparing his total pattern of responses with accepted diagnostic standards.[81]

On the basis of the tests, Dr. Blum found that Murdock was alienated and sullen, with "paranoid and sociopathic trends almost ingrained and severe enough to be diagnosed as a character disorder." When the court asked the psychologist to support his opinion with facts, the following dialogue ensued:

THE WITNESS: On the Minnesota Multiphasic Personality Inventory, it is a series of 500 or so true and false statements which have been standardized against people with known mental symptoms and complaints. There are various patterns, profiles we call them, based on the way an individual re-

78. *But cf.* United States v. Leazer, 460 F.2d 864 at 868–872 (D.C.Cir. Jan. 19, 1972), (Bazelon, C. J., concurring).

We have often commented on the special difficulties that confront trial counsel in attempting to present an adequate insanity defense. *See, e. g.,* Heard v. United States, 121 U.S.App.D.C. 37, 45, 348 F.2d 43, 51 (1965) (statement of Bazelon, C. J.) ; Henderson v. United States, 123 U.S.App.D.C. 380, 385, 360 F.2d 514, 518–519 (1966) (concurring opinion) ; Rollerson v. United States, 119 U.S.App.D.C. 400, 406, 343 F.2d 269, 274–275 (1964) ; Jackson v. United States, 118 U.S.App.D.C. 341, 343–347, 336 F.2d 579, 581–585 (1965) (Bazelon, C. J., concurring and dissenting).

In this case, trial counsel apparently thought the government would assume full responsibility for presenting the results of the court-ordered examination at St. Elizabeths Hospital. Counsel made no serious effort to find and call as a witness Dr. Pittman, who had administered the psychological tests under the supervision of Dr. Blum; counsel explained that he thought Dr. Pittman would simply come without a subpoena, as a matter of course, along with all the other witnesses from the Hospital. Insanity Transcript at 127. *See* Ins. Tr. at 16, 20, 23, 25.

79. The Wechsler Adult Intelligence Scale, the Bender-Gestalt Test, the Rorschach Inkblot Test, the Thematic Apperception Test, the Minnesota Multiphasic Personality Inventory, the Rotter Incomplete Sentences Test, and a projective drawings test.

80. For this proposition, the trial judge cited Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967), which asks for the "facts and analysis" underlying expert conclusions.

81. For example, the MMPI is a list of questions, to which the subject answers "yes", "no", or "cannot say." Several different scores are computed arithmetically. The argument for the reliability of the test rests entirely on the statistical correlation between given patterns of scores and known personality traits. *See, e. g.,* O. Buros, Personality Tests and Reviews 1119 et seq. (1970) ; R. Lanyon, A Handbook of MMPI Group Profiles (1968).

sponds to 500 some odd items. Mr. Murdock's pattern of responses is very similar to standardized groups of people who are known to have—known to be sullen, known to be alienated, known to be a kind of loner, not being identified with any of the establishment's kinds of views.

THE COURT: That is an opinion.

THE WITNESS: No, I am telling you a fact.

THE COURT: I beg your pardon, Doctor. That is an opinion. Give them the facts on which you reached that opinion. What answers did he give that led you to that opinion? Give us some examples of sullen answers to questions.

.  .  .  .  .  .

THE WITNESS: I don't have the raw —the actual MMPI which I want to talk about. I have the summary sheet. I don't have the actual 568 questions. I have his responses, but I don't know what the actual questions were. I just have a summary sheet here which essentially is just comparing the results of that, not breaking down to the various parts. I do have the results of other tests which I perhaps can go into to justify the sullen quality, the idea of being alone and against the system, and things of that sort.

Murdock's counsel then attempted to elicit from the witness the specific test responses that the trial court clearly wanted.

[DEFENSE COUNSEL]: What test do you have the actual questions or raw materials on?

A: Well, I have responses, for example, to the sentence completion test which is a series of beginning sentences and the individual is supposed to then follow through and put the answers. Like, "I like—" and then the individual is supposed to add to this.

Q: It there any such thing as a representative sampling of those questions?

A: Yes.

Q: Would you read several representative questions?

A: O.K. Back home everybody is well. At bedtime I go to sleep. Men will be men. A mother should love her family. I need freedom. The future is not—

Q: Don't read the whole test.

A: This is just a sample. I am showing the fact that he is not—You know, this manner of questioning is most difficult to me. It is so difficult— These tests are looked at and combined, I mean, in its totality. Individually we can come up with some conclusions based on each test, but they only make sense when they are compared to other tests and the relationships between them comparing to what we know about the individual totally. I can't isolate and on the basis of a few responses say he is this or that. There is consistent evidence in various tests to show that he basically harbors a good deal of resentment, that he does seem to have a tendency to blame others for things he is very inadequate in. I have evidence which shows he does seem to feel basically inadequate and things of that sort.

THE COURT: Mr. Witness, you are entitled to those opinions, but you are not the judge. The jury is the judge of the facts and, therefore, you are required to explain to the jury in factual terms in whatever manner you wish to do it what the underlying material is from which you reach your opinion, because the jury is not required to accept the opinion of any expert and they have to weigh the testimony of experts and to do that they need to know what it is that the expert relied on to reach his conclusions.

Defense counsel asked no further questions of the witness, apparently in the belief that he would be unable to elicit the kind of information the trial judge was demanding.[82]

---

82. It is easy to understand how a lawyer might in these circumstances abandon in frustration the effort to examine his witness, especially if, as here, the lawyer

The problem of dealing effectively with testimony based on psychological tests is not a new one for this court. We have frequently seen attorneys and judges elicit from a psychologist a series of test questions and answers, thereby setting up an easy target for ridicule.[83] It would be inappropriate to shield these tests from scrutiny by prohibiting such questions, especially in light of the fact that the validity of psychological tests is subject to considerable question within the mental health professions.[84] Indeed, it may be that the validity of the tests is so doubtful that they should be excluded from evidence as a matter of law.[85] But if courts are willing to accept the tests as legitimate diagnostic tools, it is troublesome to see counsel or the court attempting to discredit them in a particular case by ridicule, rather than exploring their acknowledged strengths and weaknesses.

It would have been perfectly appropriate to question Dr. Blum further about the precision of his tests, the margin of error in their results,[86] and the significance of his findings in this particular case.[87] He might well have been asked how closely Murdock's responses matched the standard profile on which Dr. Blum based his evaluation—whether Murdock fit squarely in a standard category or whether the psychological evaluation was more tentative. By asking exclusively for specific test responses, which could add little to the jury's understanding of the expert's opinion, the trial judge may have inadvertently cut off the flow of information about the statistical nature of the tests, information without which the jury could not evaluate Dr. Blum's opinion testimony.

2. When the trial court's questions failed to elicit a satisfactory explanation from Dr. Blum, the court concluded that his testimony had no weight at all, and instructed the jury to disregard it. We need not decide whether that remedy would be appropriate if conclusory testimony were presented by a prosecution witness, or by an expert privately retained by the defendant. In this case, the deficient testimony was presented by an expert on the staff of a government hospital, who was required by law to examine the defendant.

Murdock moved for a mistrial, arguing that if the court-ordered mental examination was defective as a matter of

---

was inexperienced in examining experts in psychiatry and psychology. Nevertheless, his failure either to prepare his witness adequately or to pursue the examination further may well have deprived the defendant of the essence of a substantial defense, giving Murdock grounds for a claim of ineffective assistance of counsel.

83. *See, e. g.,* United States v. Leazer, 460 F.2d 864 (D.C.Cir. Jan. 19, 1972) (Bazelon, C. J., concurring) ; United States v. McNeil, 140 U.S.App.D.C. 228, 231–234, 434 F.2d 502, 505–508 (1970) (concurring opinion).

84. For a survey of current literature on the subject, see O. Buros, Personality Tests and Reviews (1970).

85. Lie-detector tests have in general been excluded from evidence on this ground. *See* Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923) ; cases cited 3A J. Wigmore, Evidence § 999 n. 2 (Chadbourn rev. 1970). *Compare* United States v. Brown et al., 461 F.2d 134 at 145–146 n. 1 (D.C.Cir. March 15, 1971) (opinions filed March 1, 1972) (Bazelon, C. J.,

dissenting) (reliability of eye-witness identifications).

86. The only testimony along these lines came from Dr. Marland, a private psychiatrist who testified for the government. Dr. Marland rejected the conclusions that Dr. Blum and his assistant had drawn from the psychological tests. He explained that "all these psychological tests are playing along the odds, for instance. I was told by one psychologist who had done a great deal of court work that the Rorschach test gave him 15 per cent false diagnosis of schizophrenia in people who had no clinical symptoms." Ins. Tr. at 198. Such a casual and unexplained comment was as likely to be misleading as helpful.

87. Compare the examination of Dr. Blum in this case with the examination of the same doctor in United States v. Leazer, 460 F.2d 864 at 871–872 (D.C.Cir. Jan. 19, 1972) (Bazelon, C. J., concurring), and in United States v. Schappel, 144 U.S.App.D.C. 240, 242, 445 F.2d 716, 718 n. 4 (1971).

law, then it would be impossible to have a fair trial on the issue of insanity. The trial court rejected that argument, having previously observed that Murdock was free to move for the appointment of an independent expert instead of relying on the testimony of Dr. Blum. In my view, the ruling was plainly erroneous.

It is firmly established in our cases that a defendant with a potential insanity defense has a legal right to a pretrial mental examination at government expense.[88]  Accordingly, Murdock was entitled to rely on the government to provide a legally adequate examination at the hospital to which he was committed for observation. If the examination afforded Murdock at St. Elizabeths Hospital proved at trial to be inadequate, it is no answer to say he could have obtained an adequate examination by a motion for the appointment of an independent expert.[89]

The trial court did not purport to rule directly on the adequacy of the examination;[90] it ruled only on the adequacy of Dr. Blum's performance as a witness. It is clear, however, that a pretrial mental examination is inadequate for its purpose if the examiner cannot explain his findings to a court. In short, the defendant's right to an adequate pretrial examination includes the right to examiners who can perform as witnesses.[91]

If Dr. Blum's testimony was legally inadequate, then that defect is not cured by the fact that another Hospital staff member testified about the pretrial mental examination. Dr. Pugh, a staff psychiatrist who testified for the government, based his opinion on a single interview and on the medical records, including a report of the psychological tests. Since the test results were presented to the jury, it was crucial for Murdock to present the views of the Hospital staff member most closely connected with those tests.[92] When the trial judge concluded that Dr. Blum's testi-

88. *See* note 60 *supra*.

89. United States v. Leazer, 460 F.2d 864 at 870–871 (D.C.Cir. Jan. 19, 1972) (Bazelon, C. J., concurring). While an indigent defendant may obtain funds for an independent expert under the Criminal Justice Act, 18 U.S.C. § 3006A(e), as amended, those funds are severely limited. Most private psychiatrists are financially out of reach of an indigent defendant. Indeed, many psychiatrists find court work too unpleasant to do at any price. In any event, Murdock had no reason before trial to suspect he would be unable to rely on the testimony of Dr. Blum.

90. The judge expressed serious reservations about the adequacy of the examination, but he denied that those reservations influenced his ruling. In colloquy at the bench, the judge expressed some concern about the fact that the person who administered the tests (1) was not a fully trained psychologist, and (2) was not present in court to testify. The judge reserved the right to strike Dr. Blum's testimony, because "what you are putting before me is not the man who did the examination, who, incidentally, was not qualified. What you are putting before me is this man's interpretation of somebody else's notes about examinations that somebody else conducted, and I don't

see how that can be given much weight, if any." Transcript at 138.

91. United States v. Leazer, 460 F.2d 864 at 870–871 (D.C.Cir. Jan. 19, 1972) (Bazelon, C. J., concurring). The adequacy of the examination is also subject to question on the ground that the staff of the maximum security division of the Hospital, which performed the examination, included not a single Board-certified psychiatrist. Indeed, some staff members had not even completed a residency in psychiatry. In Murdock's case, the diagnostic staff conference was attended by one such medical officer, described by Dr. Pugh as "not court competent."

92. The trial judge permitted Dr. Pugh to testify concerning the psychological tests, although Dr. Pugh, like Dr. Blum, failed to support his conclusions with specific test responses or other explanatory information about the tests. The question therefore arises whether the court deliberately allowed the psychiatrist greater testimonial latitude than the psychologist, and if so, on what basis. During the colloquy at the bench concerning Dr. Blum's competence to testify, *see* note 90 *supra*, the judge made some comments suggesting that the difference in treatment may have been deliberate:

You see, a psychologist has two different standings, Mr. [      ]. First, he

mony was inadmissible, he should have granted Murdock's motion for a mistrial, and ordered a new mental examination, by experts capable of explaining their conclusions to a court.[93]

It should go without saying that Murdock ought not to suffer for the inadequacy of the government psychologist's testimony. Apparently it does need saying, however, since he is made to suffer by this Court's conclusion that he can be tried and convicted without adequate expert assistance. This case is only one among a great many which clearly demonstrate that the responsibility defense is nothing more than a public ritual, maintained to satisfy the public's need for the image—and only that—of fairness and justice. It is still another indication that we have junked the defense in practice. Honesty requires us to do the same with its theory and rhetoric.

### C. *Instructions to the Jury*

I turn finally to what I regard as a serious error in the jury charge on the issue of criminal responsibility. In order to put the problem in perspective, it will be necessary to review the testimony in some detail.

1. Murdock relied primarily on the testimony of Dr. Williams, a board-certified psychiatrist, and professor at Howard University Medical School. Dr. Williams had examined Murdock on two occasions during his confinement in St. Elizabeths Hospital. According to the testimony of Dr. Williams, Murdock was strongly delusional, though not hallucinating or psychotic; he was greatly preoccupied with the unfair treatment of Negroes in this country, and the idea that racial war was inevitable. He showed compulsiveness in his behavior, emotional immaturity, and some psychopathic traits. Since his emotional difficulties were closely tied to his sense of racial oppression, it is probable that when the Marine in the Little Tavern called him a "black bastard" Murdock had an irresistible impulse to shoot.[94] His emotional disorder had its roots in his childhood, in

---

stands as an independent expert. That is one thing. The other thing is if he has made a study which the doctor relies on and the doctor takes that into account along with the ward notes and other facts and information he gets, he is in a different status. He is in aid of medical diagnosis. You are not offering this psychologist in aid of any medical diagnosis. Your doctor had no use for this report and he didn't rely on it. This man is being offered as an independent expert who has a different insight into the nature of Mr. Murdock's difficulties. It is a different question than the one that will arise in the government's witnesses.
Ins. Tr. at 144. It is not clear whether the trial judge saw in this distinction a reason to permit Dr. Pugh to testify concerning psychological tests in a conclusory manner, while Dr. Blum was not permitted to do so. His distinction between the two witnesses on this point raises serious questions under Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637 (1962).

93. If the trial judge had not stricken Dr. Blum's testimony, I would nevertheless reach the same result. For the government cannot fulfill its obligation to pro-

vide an adequate pretrial examination by providing an expert who testifies only in conclusory terms. This case is an extreme and egregious example, because the trial judge found the expert's testimony so conclusory that he decided to strike it altogether. But even if conclusory testimony remains on the record, it fails utterly to support an insanity defense. When a defendant is dependent on government doctors for the presentation of his insanity defense, conclusory testimony deprives him of the substance of his defense.

94. There is some support for this view in the testimony of Dr. Pugh, the St. Elizabeths psychiatrist who testified for the government. Dr. Pugh found no recognized psychiatric disease, but he found "predisposing factors," and could not deny the possibility that Murdock's behavior controls were impaired by an abnormal mental condition:

Whether he was under any irresistible compulsion, as I say, that is something that can't be scientifically answered. . . . As far as his personality is concerned, both by history and by psychological testing, he is a person who overreacts to the possibility of physical threat and is likely to defend himself

the Watts section of Los Angeles; particularly important was the fact that his father had deserted his mother, and he grew up in a large family with little money and little love or attention.

Dr. Williams stated firmly that in his view Murdock was suffering from an abnormal mental condition that substantially impaired his behavior controls. But he stated just as firmly that the condition did not amount to a mental illness:

> My idea of mental illness is that an individual is out of touch with reality. He has auditory hallucinations, he has delusions, he has mannerisms that set him off as a different individual. He withdraws from society. And his behavior as such is tremendously bizarre. This is what I call, what they would call at Johns Hopkins, a major psychosis and a form of mental illness.

> .    .    .    .    .    .

> I look on [Murdock's condition] as psychoneurosis, but not, as such, a form of mental illness. It is not a psychotic reaction, which I consider a mental illness. It is an emotional response, an emotional illness. Not a mental illness in that it is psychotic.

Ins. Tr. at 102–03.

This court has made it perfectly plain that for purposes of the insanity defense, "mental illness" is a legal term of art. A criminal defendant's responsibility cannot turn on the label attached to his condition.[95] The insanity defense is neither expanded nor contracted by changing fashions in psychiatric terminology. In particular, mental illness for our purposes is not limited to psychosis;[96] it includes any "abnormal condition of the mind that substantially affects mental or emotional processes and substantially impairs behavior controls."[97]

Defense counsel was thus confronted with a serious dilemma, arising from the fact that "mental illness" meant one thing to his witness, and another to the law. It was clear that the law would permit a jury to find mental illness on the basis of Dr. Williams's testimony about Murdock's "abnormal condition."[98] In practice, however, a jury might well be reluctant to look beyond the doctor's statement that the condition did not amount to mental illness as he understood the term.[99]

---

against physical threats that are not as great as he sees them being. There are predisposing factors. But I don't think that any of them can be said to constitute a compulsion or some kind of a disabling of his willpower or decision-making capacity.
Ins. Tr. at 217–18.
Only Dr. Marland, the independent psychiatrist appointed at the government's request, rejected with assurance the possibility that Murdock's behavior controls were impaired by an abnormal mental condition. Dr. Marland examined Murdock on two occasions in the D.C. Jail, after he had been released from the Hospital. He found that Murdock had some neurotic symptoms, but he regarded them as no more incapacitating than a headache or a digestive disturbance. As for the impact of Murdock's childhood experiences:
Every man is influenced to some degree by his background and he is influenced by his background and general personality traits. But influenced to the degree where he was unable to make a decision

as to what he would do, this I do not believe.
Ins. Tr. 175.

95. *See* United States v. Eichberg, 142 U.S. App.D.C. 110, 116–117, 439 F.2d 620, 626–627 (1971) (concurring opinion).

96. See, e. g., Millard v. Harris, 132 U.S. App.D.C. 146, 150, 406 F.2d 964, 968 (1968); McDonald v. United States, 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1962) (*en banc*); Wright v. United States, 102 U.S.App.D.C. 36, 43–44, 250 F.2d 4, 11–12 (1957) (*en banc*).

97. McDonald v. United States, 114 U.S. App.D.C. at 124, 312 F.2d at 851.

98. The trial judge took a different view of the evidence, but wisely submitted the case to the jury "in my exercise of my discretion and to avoid the necessity of another trial." Ins. Tr. at 238.

99. In closing argument, the prosecutor emphasized the fact that no witness had testified to mental illness, not even the defense witness. Accordingly, he argued,

Counsel's strategy was to bypass the troublesome term "mental illness," and invite the jury to focus directly on the legal definition of that term. He conceded to the jury that Murdock "did not have a mental disease in the classic sense," i. e., he did not have a psychosis. But, counsel argued, the expert testimony showed that at the critical moment Murdock did not have control of his conduct, and the reason for that lack of control was a deepseated emotional disorder that was rooted in his "rotten social background." [100] Accordingly, he asked the trial court to omit the term "mental disease or defect" from the jury instructions. I think his proposal was ingenious; the trial court might well have framed a suitable instruction asking the jury to consider whether Murdock's act was the product, not of "mental illness," but of an "abnormal condition of the mind that substantially affects mental or emotional processes and substantially impairs behavior controls."

While the trial court denied the requested instruction, we cannot say that ruling was error. The judge carefully instructed the jury to resolve the question of mental illness in accordance with its legal definition; he told them they were not bound by medical conclusions as to what is or is not a mental disease, and he told them to ignore defense counsel's concession that Murdock was without mental disease. In this respect the instructions conform to the requirements set forth in our cases.

But the judge injected into the instructions a special note of caution, in response to the testimony and argument presented in this case. He told the jury:

> We are not concerned with a question of whether or not a man had a rotten social background. We are concerned with the question of his criminal responsibility. That is to say, whether he had an abnormal condition of the mind that affected his emotional and behavioral processes at the time of the offense.

Ins. Tr. at 262. Defense counsel had objected to that instruction before it was given, because his theory of the case was that Murdock had an abnormal mental condition caused in part by his "rotten social background." The trial court overruled his objection, deeming the instruction necessary to counteract what he saw as an attempt by defense counsel to appeal to the jurors on the basis of sympathy, or passion, or prejudice.[101]

"[h]ow can you relieve [Murdock] of responsibility, if you have got no evidence to state that he was mentally ill?" Ins. Tr. at 255.

100. In the language of the closing argument of Murdock's counsel:

Dr. Williams premised his conclusion on the fact that this man had had what we might call a rotten social background. Now we know that most people survive rotten social backgrounds. But most people are not now here at this time on trial. The question is whether the rotten social background was a causative factor and prevented his keeping controls at that critical moment.

. . . . .

At the critical moment when he stepped back in the Little Tavern restaurant and he was faced with five whites, with all of his social background, with all of his concepts, rightly or wrongly, as to whether white people were the bogeymen that he considered them to be, the question at this moment is whether he can control himself. That is the only question. Now you can expand it out, but the only question is not the question of how you label what he had. If you label it mental disease or not. But the real question is whether he had control of himself. Now you have got to take the trip back through his lifetime with him and look at the effect that his lifetime had on him at that moment and determine whether he could control himself or not.

Ins. Tr. at 251–52.

101. THE COURT: . . . I will tell them it is not in any way a question of his rotten social background.

[DEFENSE COUNSEL]: I object.

THE COURT: You may.

[COUNSEL]: May I state my reasons?

THE COURT: You may.

[COUNSEL]: I was talking in terms of the cause of his condition. .

It may well be that the trial judge was motivated by a reasonable fear that the jury would reach its decision on the basis not of the law but of sympathy for the victims of a racist society. Nevertheless, I think that the quoted instruction was reversible error. It had the effect of telling the jury to disregard the testimony relating to Murdock's social and economic background and to consider only the testimony framed in terms of "illness." Such an instruction is contrary to law, and it clearly undermined Murdock's approach to the insanity defense in this case. For Murdock's strategy had two parts: first, he sought to convince the jury to disregard Dr. Williams' finding of no "mental illness," and then he sought to persuade them to find mental illness in the legal sense of the term. The jury could hardly consider the issue of mental illness without considering Murdock's background, in view of the fact that all the witnesses traced such disabilities as they found at least in part to his background.[102]

2. No matter what the trial judge intended, his instruction may have deprived Murdock of a fair trial on the issue of responsibility. But even if that instruction had not been offered, Murdock could argue that he was denied a fair opportunity to present his particular responsibility defense—a defense not clearly grounded on any medically recognized "mental disease or defect." While the language of our responsibility test theoretically leaves room for such a defense, our experience reveals that in practice it imposes illogical constraints on the flow of information to the jury and also on the breadth of the jury's inquiry. Our test demands an "abnormal condition of the mind," and that term carries implications that may mislead counsel, the court, and the jury.[103]

*McDonald* defined mental illness for purposes of the responsibility defense as an abnormal condition of the mind that "substantially affects mental or emotional processes and substantially impairs behavior controls." [104] The thrust of Murdock's defense was that the environment in which he was raised—his "rotten social background"—conditioned him to respond to certain stimuli in a manner most of us would consider flagrantly inappropriate. Because of his early conditioning, he argued, he was denied any meaningful choice when the racial insult triggered the explosion in the restaurant.[105] He asked the jury to conclude that his "rotten social background," and the resulting impairment of mental or emotional processes and behavior controls, ruled his violent reaction in the same manner that the behavior of a paranoid schizophrenic may be ruled by his "mental condition." Whether this impairment amounted to an "abnormal condition of the mind" is, in my opinion, at best an academic question. But the consequences we predicate on the answer may be very meaningful indeed.

We have never said that an exculpatory mental illness must be reflected in some organic or pathological condition.[106] Nor have we enshrined psychosis as a prerequisite of the defense. But our experience has made it clear that the terms we use—"mental disease or defect" and "abnormal condition of the mind" —carry a distinct flavor of pathology. And they deflect attention from the

---

THE COURT: No, you weren't sir. You were appealing in the most direct way to something that I am going to keep out of the courtroom, if I stay a Judge. I am not going to permit it to come in here. [Tr. 259.]

102. A similar instruction was treated as plain error in State v. Vigliano, 43 N.J. 44, 62–66, 202 A.2d 657, 666–668 (1964).

103. *See* A. Goldstein, The Insanity Defense 5 (1967).

104. McDonald v. United States, 114 U.S. App.D.C. 120, 124, 312 F.2d 847, 851 (1962).

105. *See* United States v. Carter, 141 U.S. App.D.C. 46, 56–57, 436 F.2d 200, 210–211 (1970) (Bazelon, C. J., concurring).

106. That is, however, the official position in the Soviet Union. *See* Introduction by D. L. Bazelon to Forensic Psychiatry (G. V. Morozov & I. M. Kalashnik eds.) xvi–xxi (1970).

crucial, functional question—did the defendant lack the ability to make any meaningful choice of action [107]—to an artificial and misleading excursion into the thicket of psychiatric diagnosis and nomenclature.

It does not necessarily follow, however, that we should push the responsibility defense to its logical limits and abandon all of the trappings of the medical or disease model. However illogical and disinguous, that model arguably serves important interests. Primarily, by offering a rationale for detention of persons who are found not guilty by reason of "insanity," it offers us shelter from a downpour of troublesome questions. If we were to facilitate Murdock's defense, as logic and morality would seem to command, so that a jury might acquit him because of his "rotten social background" rather than any treatable [108] mental illness, the community would have to decide what to do with him.

If acquitted because he lacked responsibility, Murdock would automatically have been committed to St. Elizabeths Hospital for further examination.[109] He could then obtain an unconditional release only upon the certification of the hospital superintendent "(1) that such person has recovered his sanity, (2) that, in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others * * *." [110] Plainly, the Hospital would find it difficult to justify holding Murdock on the grounds that he was insane in any conventional sense.[111] None of the psychiatrists who testified at trial, including those from St. Elizabeths, suggested that his "sanity" had ever been lost.

Nevertheless, Murdock may well be dangerous. We have no carefully-crafted technique for resolving the complex of legal, moral, and political questions concealed in the determination of dangerousness.[112] Regrettably, those questions

---

107. Such that it would be unjust to hold him responsible. *See* United States v. Bennett, 460 F.2d 872 at 876–878 (D.C. Cir. Jan. 19, 1972) ; United States v. Eichberg, 142 U.S.App.D.C. 110, 113, 439 F.2d 620, 623 (1971) (Bazelon, C. J., concurring).

108. *See* note 117 *infra.*

109. D.C.Code § 24–301(d) (Supp. IV, 1971) ; Bolton v. Harris, 130 U.S.App. D.C. 1, 395 F.2d 642 (1968).

110. D.C.Code § 24–301(e). *See* page 962 *infra.*

111. *Cf.* Livermore & Meehl, The Virtues of M'Naughten, 51 Minn.L.Rev. 789, 804 (1967) : "[T]he criminal law has usually used the term [mental disease] in what one writer has called its core concept, '*i. e.*, with regard to such conditions in which the sense of reality is crudely impaired and inaccessible to the corrective influences of experience—for example, when people are confused or disoriented or suffer from hallucinations or delusions.'" Quoting from Waelder, Psychiatry and the Problem of Criminal Responsibility, 101 U.Pa.L.Rev. 378, 384 (1952).

112. *See* Dershowitz, The Law of Dangerousness: Some Fictions About Predictions, 23 J.Leg.Ed. 24, 41–42 (1970) :

It will be instructive to restate the problem of civil commitment without employing medical terms * * *

There are, in every society, people who cause trouble if not confined. The trouble may be serious (such as homicide) ; trivial (making of offensive remarks) ; or somewhere in between (forging checks). The trouble may be directed at others, at the person himself, or at both. It may be very likely that he will cause trouble, or fairly likely, or fairly unlikely. In some instances this likelihood may be considerably reduced by a relatively short period of involuntary confinement; in others, a longer period may be required with no assurances of reduced risk; in still others, the likelihood can never be significantly reduced. Some people will have fairly good insight into the risks they pose and the costs entailed by an effort to reduce those risks ; others will have poor insight into these factors.

When the issues are put this way, there begins to emerge a series of meaningful questions capable of traditional legal analyses :

What sorts of anticipated harm warrant involuntary confinement?

How likely must it be that the harm will occur? Must there be a significant component of harm to others, or may the harm be to self alone?

are now decided, at least in the first instance, by psychiatrists. We can only speculate on the outcome of their inquiry.

They might conclude that Murdock's rage and resentment were burned off by the explosion in the restaurant; the cathartic effect of his violent outburst may have made its repetition unlikely.[113] On the other hand, the crime Murdock committed is a prototype of the crimes that arouse the greatest public anxiety. He seems to be a man whose bitterness and racial hostility have turned into blasting powder which can be touched off by a spark. Since there is no obvious way to insulate him from further sparks, and since the powder is not being deactivated, further explosions may be unavoidable. It would not be surprising if the psychiatrists took the view that Murdock is now, and is likely to remain, extremely dangerous.

However accurate the prediction of dangerousness, it is not at all clear that the statute would permit Murdock's confinement. Read literally, the statute seems to establish a return to sanity and an absence of dangerousness as independent pre-conditions of unconditional release. D.C.Code § 24–301(e). That reading would require the hospitalization of a dangerous person who lacked any mental illness whatsoever. Our cases have made it clear, however, that "dangerousness" refers to "dangerousness by reason of mental illness." Thus, a defendant who was dangerous but no longer insane could not be involuntarily hospitalized. See Dixon v. Jacobs, 138 U.S.App.D.C. 319, 328, 427 F.2d 589, 598 (1970).[114] If Murdock cannot be considered insane, the hospital would have to release him.

We are left, therefore, with an obligation to choose among four unattractive alternatives:

A. We can impose narrow and admittedly illogical limitations on the responsibility defense to insure that a defendant like Murdock will not be acquitted on the theory that he lacked responsibility. By confining such a defendant in a penitentiary, we can avoid the difficult questions presented by the effort to hold him in confinement following a successful use of the responsibility defense.[115]

---

If harm to self is sufficient, must the person also be incapable, because he lacks insight, of weighing the risks to himself against the costs of confinement?

Must the likelihood of the harm increase as its severity decreases? Or as the component of harm to others decreases? How long a period of involuntary confinement is justified to prevent which sorts of harms?

*Cf.* Cross v. Harris, 135 U.S.App.D.C. 259, 263–265, 418 F.2d 1095, 1099–1101 (1969).

113. This seems to have been the view of one of the psychiatrists who testified at trial on behalf of the defense:

Q: In other words, you are telling us that this condition suddenly came on at the time of the shoting at the Little Tavern and then immediately disappeared? Is that right?

A: More or less. This is what happens: that once you get this urge, this feeling over, it disappears. It is what we call an irresistable urge and once this impulse is aroused and satisfied by whatever way satisfied, the individual is completely relaxed.

Insanity transcript at 80.

114. "The patient need only establish * * that he is no longer likely to injure himself or other persons *because of mental illness.* Bolton v. Harris, 130 U.S.App. D.C. 1, 12, 395 F.2d 642, 653 (1968)." (Emphasis supplied.) *See also* Dershowitz, *supra* note 112, at 32: "The one universal criterion for involuntary hospitalization is the presence of mental illness."

115. A recent Maryland decision provides a striking illustration of the point. In Dennis v. State, 13 Md.App. 564, 284 A.2d 256 (1971), the responsibility defense failed because of the court's finding that the defendant had not presented enough evidence of insanity to take the case to the jury on that issue. The chief witness for the defense, the court pointed out, was primarily concerned "that the appellant not be subjected to the punitive process but rather to a course of treatment * * *" The court concluded that the "net effect of her testimony cannot be

B. If we remove the practical impediments to Murdock's defense and he is, in fact, acquitted for lack of responsibility, he could be released from custody in spite of his apparent dangerousness. That result would conform with the principle that civil commitment is ordinarily barred where a defendant is dangerous but not mentally ill.[116]. And there are even precedents for the acquittal and release of dangerous defendants who have been brought to trial on a criminal charge. The fourth amendment exclusionary rule, for example, effectively precludes conviction of some defendants who appear to be dangerous. But that rule has been subjected to heavy assault even though it serves important, extrinsic interests—the redress and deterrence of unconstitutional action and the preservation of judicial integrity. Acquitting a defendant like Murdock and returning him to the street might also protect our integrity. But it would probably be more difficult to obtain public support for, or even unfriendly acquiescence in, Murdock's release than to defend the operation of the exclusionary rule. It could be said, after all,

that acquittal would result not in spite of Murdock's dangerousness, but precisely because of it. Thus, while there may be no reason in logic why Murdock could not be returned to the street, as a practical matter that is probably an unfeasible result.

C. If the community will not tolerate Murdock's release we can strive to find a vaguely therapeutic purpose for hospitalization. Skinnerian-like techniques may be available to re-program his behavior. We might conclude that they should be used and that their use justifies his confinement. But that will require us to stretch the medical model substantially so that new techniques can be applied to many persons not conventionally considered "sick." [117]

I do not mean to suggest the existence of a bold line which segregates the orthodox, universally-admired techniques, from the techniques which are unconventional, morally and legally troublesome, and as yet unaccepted. Some commentators have insisted that the most traditional techniques, including psychotherapy, should never be imposed on an unwilling subject.[118] And some of the

said to support an affirmative expert opinion that this appellant lacked the substantial capacity to conform his conduct to the requirements of law." The "treatment" which the witness had in mind was the administration of a drug called Provera, which, according to the witness, would amount to a "chemical semicastration, reducing the sexual urge." The defendant had been charged with rape. By framing the issue as a choice between "punishment" and "treatment," and by remitting the defendant to the former rather than the latter, the court had no occasion to explore any of the extremely difficult questions that arise in connection with the "treatment" option. Specifically, the court did not have to decide the limits, if any, on the state's power to hold in custody a person acquitted (by reason of a lack of responsibility) of a criminal charge, and to "treat" him by "chemical semicastration." (Of course, the question not reached by the court may very well be reached and decided, *sub rosa*, by the prison authorities.)

116. *See, e. g.*, In re Williams, 157 F.Supp. 871, 876 aff'd sub nom. Overholser v.

Williams, 102 U.S.App.D.C. 248, 252 F.2d 629 (1958) ("The courts have no legal basis for ordering confinement on mere apprehension of future unlawful acts. They must wait until another crime is committed or the person is found insane."); Dershowitz, *supra* note 112, at 40–41.

117. One clear imperfection in the treatment rationale used to justify detention of "insane" defendants is that some of these defendants may be suffering from untreatable illnesses. Nevertheless, the rationale is not jeopardized by that imperfection to the same extent that it would be jeopardized by Murdock's detention. After all, with some squirming we can find a therapeutic basis for hospitalizing persons with recognized but untreatable ailments who may someday be amenable to treatment. It would undoubtedly be a great deal more difficult to hit upon a "medical" justification for holding Murdock if he should be acquitted for lack of responsibility.

118. *See, e. g.*, T. Szasz, Law, Liberty & Psychiatry (1963).

techniques which raise the most profound moral and legal questions are already being put to use.[119] Still, there does seem to be a continuum running from the less controversial to the more controversial techniques.[120] Without suggesting that we can blink at the techniques that are now widely used, it seems clear to me that we must, at the very least, scrutinize with care the implications of advancing further along the continuum.

D.  Finally, if there are no known or foreseeable techniques for "curing" someone like Murdock (or if we are unwilling to utilize the techniques that may be available), and if the incapacitation of the defendant is a practical imperative, we will have to confine him in exclusive reliance on a prediction of dangerousness. That confinement would be nothing more or less than unadorned preventive detention.

The options that would permit us to acquit Murdock but hold him in custody nonetheless—preventive detention and a stretching of the medical model to permit the use of new techniques—raise profound moral and legal questions. Resolution of those questions would require a prolonged and thorough public debate. But however they are resolved, it is at least clear that each of these options requires an expansion of the boundaries of the civil commitment doctrine. We could strive to limit the expansion by applying the new rationale

only to persons who have undergone a criminal trial and been acquitted for lack of responsibility. But as a practical matter it seems very unlikely that the expansion could be so confined. The new rationale would permit—perhaps demand—that all persons who are rendered dangerous by a "rotten social background" should be preventively detained. Or that all persons who exhibit anti-social behavior patterns should have their behavior re-conditioned. We cannot escape the probability, if not absolute certainty, that every effort to diminish the class of persons who can be found criminally responsible will produce a concomitant expansion in the class of persons who can be subjected to involuntary civil commitment. The implications in this context are staggering. The price of permitting Murdock to claim the benefit of a logical aspect of the responsibility doctrine may be the unleashing of a detention device that operates, by hypothesis, at the exclusive expense of the lowest social and economic class.

That result can certainly be avoided—even if we are unwilling to return the defendant to the street—by reading the responsibility doctrine so narrowly that the issue of post-acquittal custody rarely arises. (*See* Option A at pages 962–963 *supra*.) We could, for example, redefine the concept of responsibility so that it would approximate the concept of self-defense. All civil and criminal sanctions

---

119. *See, e. g.*, Breggin, The Return of Lobotomy and Psychosurgery, 118 Cong. Rec. No. 26 (Feb. 24, 1972) ; N. Kittrie, The Right to be Different 297–339 (1971) ; Note, Conditioning and Other Technologies Used to "Treat?" "Rehabilitate?" "Demolish?" Prisoners and Mental Patients, 45 U.So.Calif.L.Rev. 616 (1972).

120. The positioning of any particular technique along that continuum is obviously a difficult enterprise. On the whole, distinctions based on "coerciveness" or "intrusiveness," *see* Note, *supra* note 119, at 619–21, seem unhelpful, since virtually every technique would be extremely coercive if it could be made to work perfectly. It may well be that techniques

such as psychotherapy and psychodrama are thought to raise fewer moral questions than lobotomies, shock treatment and the like, because of a widely-held assumption that the former are far less likely than the latter to effect any significant, long-lasting alteration in the subject's behavior or physical condition, especially where the subject is uncooperative. If that theory, and the assumption on which it rests, are valid, then a very difficult question arises : If we can tolerate the use of only those techniques that are unlikely to "work," in the sense of altering behavior or physical condition, how can we continue to justify involuntary hospitalization on the grounds that it permits us to use those very techniques in the "treatment" of mental illness?

on the nonresponsible defendant would be barred, and the test would be reformulated to ask explicitly, which defendants should escape all state-imposed sanctions.[121] Alternatively, we could retain the medical model and acknowledge its illogic as a significant virtue. Psychosis may be an irrational test of criminal responsibility, but it does have a recognizable symptomatology. In the civil commitment context it may provide the only manageable stopping point short of a fullfledged scheme of preventive detention. These limitations on the responsibility defense permit an avoidance —perhaps to the good—of a confrontation with the difficult questions posed by preventive detention and the various forms of behavior control.

On the other hand, we sacrifice a great deal by discouraging Murdock's responsibility defense. If we could remove the practical impediments to the free flow of information we might begin to learn something about the causes of crime. We might discover, for example, that there is a significant causal relationship between violent criminal behavior and a "rotten social background." [122] That realization would require us to consider, for example, whether income redistribution and social reconstruction are indispensable first steps toward solving the problem of violent crime.

\* \* \*

Each of these approaches to the responsibility doctrine has significant advantages and disadvantages. No one can fault us for choosing the wrong approach. We can be faulted, however, for refusing to make any choice at all—or at least for refusing to confront the implications and shortcomings of our de facto choice. It is a critical responsibility of courts, legislatures and commentators to undertake a purposive analysis of the responsibility defense, instead of merely paying it lip-service in deference to its historical significance and our "liberal" consciences.[123] Under each of the prevailing tests of criminal responsibility, the operation of the defense has been haphazard, perfunctory, and virtually inexplicable. If we cannot overcome the irrational operation of the defense, we may have no honest choice but to abandon it and hold all persons criminally responsible for their action.

McGOWAN, Circuit Judge:

The tragic and senseless events giving rise to these appeals are a recurring byproduct of a society which, unable as yet to eliminate explosive racial tensions, appears equally paralyzed to deny easy access to guns. Cultural infantilism of this kind inevitably exacts a high price, which in this instance was paid by the two young officers who were killed. The ultimate responsibility for their deaths reaches far beyond these appellants.

As courts, however, we administer a system of justice which is limited in its reach. We deal only with those formally accused under laws which define criminal accountability narrowly. Our function on these appeals is to determine whether appellants had a fair opportunity to defend themselves, and were tried and sentenced according to law.

121. This reformulation could be termed an "abolition" of the insanity defense, with the defense of *mens rea* left standing. *See* Goldstein & Katz, Abolish the "Insanity Defense"—Why Not?, 72 Yale L.J. 855 (1963).

122. We already know, of course, that there is an enormous *coincidental* relationship between violent street crime and "rotten social backgrounds." And the data plainly suggests that there is a strong *causal* relationship as well. *See, e. g.*, Staff Report to the Nat'l Comm. on the Causes and Prevention of Violence, Vol. 12, Chapter 11: Sociological and Cultural Explanations (1969).

123. In a forthcoming book which I have been privileged to see in manuscript, Professor Alan Dershowitz initiates precisely this sort of inquiry, focusing on the entanglement of the responsibility defense with the doctrine of civil commitment. I have attempted in the final pages of this opinion to do no more than touch upon the questions raised and analyzed by Professor Dershowitz's illuminating and unprecedented study.

*No. 23,190*

Appellant Alexander in his appeal raises only the question of whether there was sufficient evidence to support the verdict against him on the four counts of assault.[1] He urged in this regard that the record evidence did not establish that Alexander had pointed his gun at any of the four people who were the subject of these counts. Alternatively, Alexander asserted that, even if the evidence be taken to indicate that Alexander had pointed his gun at the four people as a group, that in law could only constitute one offense of assault as distinct from four; and that only one sentence could be imposed by way of punishment.

The testimony with respect to the pointing of the gun by Alexander is somewhat diverse and confused, which is not surprising considering the circumstances from which it arose. What does emerge incontestably is that Alexander pointed his gun in a menacing manner at the Marine party, and that each of that group was reasonably justified in believing that he or she was in mortal danger, thereby giving rise in my view to separate offenses of assault. My colleagues, although not rejecting this view of the testimony, have concluded that only one offense of assault could have been committed; and they therefore vacate the convictions on three counts of assault and remand for resentencing on the fourth. I, on the authority of Barringer v. United States, 130 U.S.App. D.C. 186, 399 F.2d 557 (1968), cert. denied, 393 U.S. 1057, 89 S.Ct. 697, 21 L.Ed.2d 698 (1969), do not agree that the sentences are improper.

Although the issue is not raised by appellant Alexander, Judge Bazelon would reverse his assault convictions on the ground that an erroneous aiding and abetting instruction was given and that, despite the jury's eventual finding that Alexander was not guilty of second degree murder, Alexander was fatally prejudiced in the jury's consideration of the assault counts. Judge Smith and I are of the view that no such result is compelled on this record. Pretermitting, for present purposes only, the question of whether the aiding and abetting instruction was or was not justified by the evidence, it is obvious that its practical significance for Alexander—and for the jury—was in relation to Alexander's possible complicity in the actual shooting by Murdock. It seems wholly unlikely that the jury could have had any doubts about Alexander's prior and independent confrontation of the Marine party with his own gun.

█ The aiding and abetting instruction undoubtedly gave the jury a difficult problem with respect to Alexander's accountability under the second degree murder charge. Its verdict of not guilty suggests strongly that the jury did not believe that Alexander anticipated the shooting intervention by Murdock. It does not suggest the thought that Alexander's only assault was that of aiding Murdock to menace the party by this intervention. Thus, our conclusion is that, even if it be assumed for this purpose only that the aiding and abetting instruction was unwarranted, the giving of it does not necessitate the reversal of Alexander's conviction on the assault counts, however difficult a problem we might have if the jury had found Alexander guilty of second degree murder. The fact would seem to be that the evidence in this record is slight that Alexander aided or abetted the fatal shooting, but is, at the same time, very strong indeed that Alexander committed his own assault upon the members of the party. Any substantial motivation for the jury to compromise is missing.[2]

---

1. His appeal does not appear to challenge his conviction on the count of carrying a dangerous weapon.

2. By the same token, the record indications that Alexander was acting in self-defense, about which Judge Bazelon professes concern, appear to us insubstantial.

*No. 23,783*

■ Appellant Murdock's claims of error on appeal are principally that (1) the evidence was inadequate to support his conviction of second degree murder, and (2) the trial court erred in refusing an instruction that the evidence of mental impairment adduced by the defense, although insufficient to require an acquittal under the insanity defense, may be regarded by the jury as sufficient to negate the element of malice.[3]

As to the first of these matters, the court is unanimous in its view that the issue of malice was for the jury and that, on the evidence before it, a finding that malice existed is sustainable. The court is also unanimous in its view that the existing instructions in use in this circuit do not differentiate properly between provocation and heat of passion as a defense to second degree murder, on the one hand, and the essential elements of manslaughter, on the other. We think the discussion of this contained in Part 1 E of Judge Bazelon's opinion is helpful, and we join in the proposal of a revised instruction for use hereafter.

■ With respect to the second question of the instruction on diminished responsibility, the rejection of this instruction by the trial court was clearly within the terms of the law as it has been thus far conceived to be by this court. *See* Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946); Stewart v. United States, 129 U.S.App.D.C. 303, 394 F.2d 778 (1968). If the law is to be changed so as to make evidence tendered in support of an insanity defense also relevant to the intent elements in the alleged crime itself independently of insanity, that must be done by the court sitting *en banc.*

Judge Bazelon finds reversal to be compelled by the failure of the trial court to declare a mistrial, as distinct from merely striking the testimony of the psychologist, Dr. Blum. The basis for this position seems to be that whenever a St. Elizabeths staff witness, called by the defense, proves unable to give legally admissible testimony about a court-ordered commitment to the hospital for examination, the defense is entitled to a mistrial. It presumably can have no other basis for the reason that, although Judge Bazelon looks with a not uncritical eye on the court's treatment of this witness, he nowhere concludes that the court erred in striking the testimony.

■ Such a conclusion could not, we believe, he reached by anyone reading the entire portion of the transcript covering Dr. Blum's appearance. That discloses that the trial court itself never terminated the opportunity of the defense to elicit competent testimony from Dr. Blum; and most, if not all, of the difficulty was due to a failure of communication, ending in evident mutual exasperation, between defense counsel and his witness, reflecting either an unawareness or a disregard of our admonitions about conclusory expert testimony in Washington v. United States, 129 U.S. App.D.C. 29, 390 F.2d 444 (1967). It may be that there are special problems in accommodating *Washington* to testimony by psychologists, as distinct from psychiatrists. But we made no such distinction in *Washington,* and the trial judge appears to have been adhering to the doctrine laid down by us in that case.

The declaration of a mistrial was not the only alternative consistent with fairness. Expert witnesses from St. Elizabeths or anywhere else must testify by reference to *Washington,* and counsel who call them as witnesses must see to it that they do. The mere fact that St. Elizabeths personnel are employed by the same Government which has provided for the examination commitment does not alter this fact, or mean that every trial must be aborted whenever such a witness falters in this respect.

---

3. Murdock's other contention is that the presence of prosecution witnesses in the courtroom during the *voir dire* and a brief period of pretrial argument constitutes reversible error. There was no defense objection to this presence; and, in any event, we find nothing to elevate this incident to the level of reversibility.

In any event, the prejudice was minimal. The jury in fact heard all of Dr. Blum's testimony and undoubtedly related to it the testimony of Dr. Pugh, the psychiatrist from St. Elizabeths called by the Government, that "[A]s far as his personality is concerned, both by history and *by psychological testing,* [appellant] is a person who overreacts to the possibility of physical threat and is likely to defend himself against physical threats that are not as great as he sees them being. . . . " (Emphasis supplied)

■ Judge Bazelon also finds reversal to be compelled by reason of a statement made to the jury by the court in the course of its instructions. The bare words used are not a faulty statement of the law. They remind the jury that the issue before them for decision is not one of the shortcomings of society generally, but rather that of appellant Murdock's criminal responsibility for the illegal acts of which he had earlier been found guilty; and, the court added in the next breath, that issue turns on "whether [appellant] had an abnormal condition of the mind that affected his emotional and behavioral processes at the time of the offense." This last is, of course, an unexceptionable statement of what we have declared to be the law in this jurisdiction.

If the trial court had added another sentence to the effect that the jury, in resolving the question before it, was free to take into account all the evidence placed before it, we take it that there could be no question of reversal on this ground. Judge Bazelon attributes to the court's statement the effect of telling the jury to disregard any of the evidence heard by it which bore upon the conditions under which appellant's life had been lived.[4] If the court had any such purpose, it seems odd that it initially permitted to come in all the evidence which was offered on this score. If the fact was that the court belatedly decided that the evidence should not have been received, it would have formally stricken that evidence and explicitly told the jury to disregard it. The court did not do that, although in another aspect of this appeal it acted to strike evidence already heard by the jury which the court thought was not legally appropriate for consideration by it.

In this context, the court's statement cannot be regarded as either being intended to do more, or as having the effect of doing more, than to focus the attention of the jury more precisely upon the exact legal formulation within which, and by reference to which, it was required to consider the evidence. We do not see how this can constitute reversible error, either in the abstract or in the more concrete terms of its possibly prejudicial effect upon the jury's deliberations. The jury was not aware of the reason why the judge had felt impelled to include this statement, nor did they know that it was a last-minute addition to the otherwise lengthy and complete instructions. That reason shows in the transcript of a colloquy with counsel outside the jury's hearing.

At this remove, and confronted only with a cold record, it is difficult to pass judgment on the merits of this reason. But we are not now under the necessity of deciding whether what was done was wise, but whether it was, in the context of this trial, of such a nature as to necessitate the overturning of the jury's verdict. We are not persuaded that it was.

---

4. As Judge Bazelon's opinion notes, Dr. Williams testified without hindrance and at length about the circumstances of appellant's upbringing, and attributed to them an abnormal condition of appellant's mind impairing his behavioral controls. Defense counsel, says Judge Bazelon, was placed in a "serious dilemma" by reason of Dr. Williams' harking back to his student days and refusing to say that appellant had a mental illness. But the dilemma, if any, was reduced to manageable proportions by our decisions, going back to McDonald v. United States, 114 U.S. App.D.C. 120, 312 F.2d 847 (1962), which have defined mental illness exactly in the terms of Dr. Williams' testimony. It was defense counsel's responsibility to stress this in his jury presentation, and he did just that. It was the very vigor of his effort in this regard which appeared to offend the trial court.